No. 21-cv-00167-LPS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

In re MALLINCKRODT, PLC, et al., *Debtors.*[*]

CITY OF ROCKFORD, et al., *Appellants*,

v.

MALLINCKRODT, PLC, et al., *Appellees*.

On Appeal from the United States Bankruptcy Court
for the District of Delaware, No. 20-12522 (JTD)

## BRIEF OF DEBTORS-APPELLEES

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
merchant@rlf.com
steele@rlf.com
schlauch@rlf.com

Melissa Arbus Sherry (*pro hac vice*)
James A. Tomberlin (*pro hac vice*)
Andrew Sorkin (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com
james.tomberlin@lw.com
andrew.sorkin@lw.com

*(additional counsel listed on inside cover)*

---

[*] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

George A. Davis (*pro hac vice*)
George Klidonas (*pro hac vice*)
Anupama Yerramalli (*pro hac vice*)
885 Third Avenue
New York, New York 10022
(212) 906-1200
george.davis@lw.com
george.klidonas@lw.com
anu.yerramalli@lw.com

Jeffrey E. Bjork (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
(213) 485-1234
jeff.bjork@lw.com

Jason B. Gott (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com

*Counsel for Debtors-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Mallinckrodt plc and its affiliates that are Debtors and Debtors-in-possession in the above-captioned chapter 11 proceedings (collectively, "Debtors"), by and through undersigned counsel, respectfully represent:

1.     Debtor-Appellee Mallinckrodt plc, chartered in Ireland, has no parent company, and no publicly held company owns 10% or more of Mallinckrodt plc. Mallinckrodt plc is publicly traded.

2.     Debtor-Appellee Acthar IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Unlimited Company.

3.     Debtor-Appellee IMC Exploration Company, chartered in Maryland, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

4.     Debtor-Appellee Infacare Pharmaceutical Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

5.     Debtor-Appellee INO Therapeutics LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

6.     Debtor-Appellee Ludlow LLC, chartered in Massachusetts, is a wholly-owned subsidiary of Debtor MNK 2011 LLC.

7.     Debtor-Appellee MAK LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

8.     Debtor-Appellee Mallinckrodt APAP LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx LLC.

9.     Debtor-Appellee Mallinckrodt ARD Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

10.     Debtor-Appellee Mallinckrodt ARD Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Therakos, Inc.

11.     Debtor-Appellee Mallinckrodt ARD Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

12.     Debtor-Appellee Mallinckrodt ARD IP Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Acthar IP Unlimited Co.

13.     Debtor-Appellee Mallinckrodt ARD LLC, chartered in California, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings, Inc.

14.     Debtor-Appellee Mallinckrodt Brand Pharmaceuticals LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

15.     Debtor-Appellee Mallinckrodt Buckingham Unlimited Company is chartered in Ireland.  Half of Mallinckrodt Buckingham Unlimited Company is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and the other half is owned by Debtor Mallinckrodt International Finance SA.

16.     Debtor-Appellee Mallinckrodt Canada ULC, chartered in Canada, is a wholly-owned subsidiary of non-Debtor Mallinckrodt Canada Cooperatie U.A.

17.     Debtor-Appellee Mallinckrodt CB LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

18.     Debtor-Appellee Mallinckrodt Critical Care Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

19.     Debtor-Appellee Mallinckrodt Enterprises Holdings, Inc. is chartered in California.  Half of Mallinckrodt Enterprises Holdings, Inc., is owned by Debtor Petten Holdings Inc., and the other half is owned by Debtor MEH, Inc.

20.     Debtor-Appellee Mallinckrodt Enterprises LLC is chartered in Delaware.  Half of Mallinckrodt Enterprises LLC is owned by Debtor WebsterGx Holdco LLC, and the other half is owned by Debtor Mallinckrodt ARD Finance LLC.

21.     Debtor-Appellee Mallinckrodt Enterprises UK Limited, chartered is the United Kingdom, is a wholly-owned subsidiary of Debtor MUSHI UK Holdings Limited.

22.     Debtor-Appellee Mallinckrodt Equinox Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

23.     Debtor-Appellee   Mallinckrodt   Group   S.à   r.l.,   chartered   in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

24.     Debtor-Appellee   Mallinckrodt   Holdings   GmbH,   chartered   in Switzerland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

25.     Debtor-Appellee Mallinckrodt Hospital Products Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

26.     Debtor-Appellee   Mallinckrodt   Hospital   Products   IP   Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt IP Unlimited Company.

27.     Debtor-Appellee Mallinckrodt International Finance SA, chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

28.     Debtor-Appellee Mallinckrodt International Holdings S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

29.     Debtor-Appellee   Mallinckrodt   IP   Unlimited   Company,   chartered   in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Pharma IP Trading Unlimited Company.

30.     Debtor-Appellee Mallinckrodt LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises LLC.

31.     Debtor-Appellee Mallinckrodt Lux IP S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

32.     Debtor-Appellee Mallinckrodt Manufacturing LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

33.     Debtor-Appellee Mallinckrodt Pharma IP Trading Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

34.     Debtor-Appellee Mallinckrodt Pharmaceuticals Ireland Limited, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

35.     Debtor-Appellee Mallinckrodt Pharmaceuticals Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt International Holdings S.à r.l.

36.     Debtor-Appellee Mallinckrodt Quincy S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Buckingham Unlimited Company.

37.     Debtor-Appellee Mallinckrodt UK Finance LLP is chartered in the United Kingdom.   Half of Mallinckrodt UK Finance LLP is owned by Debtor Mallinckrodt Pharmaceuticals Limited, and half is owned by Debtor Mallinckrodt International Finance SA.

38.     Debtor-Appellee Mallinckrodt UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt plc.

39.     Debtor-Appellee Mallinckrodt US Holdings LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

40.     Debtor-Appellee Mallinckrodt US Pool LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor Petten Holdings Inc.

41.     Debtor-Appellee Mallinckrodt Veterinary, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

42.     Debtor-Appellee Mallinckrodt Windsor Ireland Finance Unlimited Company, chartered in Ireland, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

43.     Debtor-Appellee Mallinckrodt Windsor S.à r.l., chartered in Luxembourg, is a wholly-owned subsidiary of Debtor Mallinckrodt Quincy S.à r.l.

44.     Debtor-Appellee MCCH LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MCCH LLC.

45.     Debtor-Appellee MEH, Inc., chartered in Nevada, is a wholly-owned subsidiary of Debtor Mallinckrodt International Finance SA.

46.     Debtor-Appellee MHP Finance LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Inc.

47.     Debtor-Appellee MKG Medical UK Ltd, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt Windsor S.à r.l.

48.     Debtor-Appellee MNK 2011 LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Brand Pharmaceuticals LLC.

49.     Debtor-Appellee MUSHI UK Holdings Limited, chartered in the United Kingdom, is a wholly-owned subsidiary of Debtor Mallinckrodt ARD Holdings Limited.

50.     Debtor-Appellee Ocera Therapeutics, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MAK LLC.

51.     Debtor-Appellee Petten Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of ST US Holdings LLC.

52.     Debtor-Appellee SpecGx Holdings LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt LLC.

53.     Debtor-Appellee SpecGx LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor SpecGx Holdings LLC.

54. Debtor-Appellee ST Operations LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

55. Debtor-Appellee ST Shared Services LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Petten Holdings, Inc.

56. Debtor-Appellee ST US Holdings LLC, chartered in Nevada, is a wholly-owned subsidiary of Debtor MEH, Inc.

57. Debtor-Appellee ST US Pool LLC, chartered in Delaware, chartered in Delaware, is a wholly-owned subsidiary of Debtor ST US Holdings LLC.

58. Debtor-Appellee Stratatech Corporation, chartered in Delaware, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

59. Debtor-Appellee Sucampo Holdings Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

60. Debtor-Appellee Sucampo Pharma Americas LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Holdings Inc.

61. Debtor-Appellee Sucampo Pharmaceuticals, Inc., chartered in Delaware, is a wholly-owned subsidiary of Debtor MEH, Inc.

62. Debtor-Appellee Therakos, Inc., chartered in Florida, is a wholly-owned subsidiary of Debtor Mallinckrodt Hospital Products Inc.

63. Debtor-Appellee Vtesse LLC, chartered in Delaware, is a wholly-owned subsidiary of Debtor Sucampo Pharmaceuticals, Inc.

64.    Debtor-Appellee WebsterGx Holdco LLC, chartered in New York, is a wholly-owned subsidiary of Debtor Mallinckrodt Enterprises Holdings, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES ................................................ xii

INTRODUCTION ...........................................................1

STATEMENT OF THE ISSUE...............................................4

STATEMENT OF THE CASE................................................4

    A.    Debtors' Engagement With The RSA Parties .......................6

    B.    The Initial Fee Motion..........................................................10

    C.    The Bankruptcy Court's Ruling On The Initial Fee Motion..............13

    D.    The Second Fee Motion .....................................................14

    E.    The Bankruptcy Court Ruling On The Second Fee Motion ..............16

    F.    Post-Fee Order Proceedings ................................................18

SUMMARY OF THE ARGUMENT ....................................................19

STANDARD OF REVIEW .........................................................21

ARGUMENT ...................................................................22

I.    THE BANKRUPTCY COURT CORRECTLY GRANTED
    DEBTORS' MOTION UNDER SECTIONS 363(b) AND 365(a)...............22

    A.    Sections 363(b) And 365(a) Apply And Are Satisfied ......................23

    B.    The Acthar Plaintiffs' Arguments About Sections 363(b) and
             365(a) Are Limited, Waived, And Meritless ......................................27

             1.    The "Executoriness" Argument Is Waived And Wrong..........28

             2.    The Bankruptcy Court Did Not Commit Clear Error In
                    Finding The Business Judgment Rule Satisfied ......................33

II.    SECTION 503(b) DOES NOT APPLY OR OTHERWISE
    OVERRIDE SECTION 363(b) OR 365(a) ...........................................34

    A.    Section 503(b)(4) Does Not Override Section 363(b) Or 365(a) .......34

             1.    There Is No Contradiction Or Superfluity ................................35

2. Arguments To The Contrary Upset Settled Practice And Prove Too Much..................................................................38

3. Courts Have Repeatedly Held That Section 503(b) Does Not Override Section 363(b) Or 365(a)...................................40

4. The Contrary Case Law Cited Is Inapposite.............................43

B. Section 503(b)'s Substantial Contribution Test Is Inapplicable ........47

III. THE ACTHAR PLAINTIFFS' REMAINING ARGUMENTS ARE SPURIOUS .................................................................................48

CONCLUSION ...........................................................................................54

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*In re Adelphia Commc'ns Corp.*,
  441 B.R. 6 (Bankr. S.D.N.Y. 2010) .................................................................38

*In re Airlift Int'l, Inc.*,
  761 F.2d 1503 (11th Cir. 1985) ..........................................................................39

*In re AMR Corp.*,
  No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) ....................................25

*In re Armstrong World Indus., Inc.*,
  348 B.R. 136 (D. Del. 2006) ........................................................................22, 25

*In re Armstrong World Indus., Inc.*,
  432 F.3d 507 (3d Cir. 2005) ...............................................................................51

*In re ASARCO, L.L.C.*,
  650 F.3d 593 (5th Cir. 2011) ..............................................................................45

*In re Bethlehem Steel Corp.*,
  No. 02 Civ. 2854, 2003 WL 21738964 (S.D.N.Y. July 28, 2003) .............*passim*

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
  988 F.2d 414 (3d Cir. 1993) ...............................................................................50

*In re Columbia Gas Sys. Inc.*,
  50 F.3d 233 (3d Cir. 1995) ..............................................................31, 32, 33

*In re Culp*,
  545 B.R. 827 (D. Del. 2016), *aff'd*, 681 F. App'x 140 (3d Cir.
  2017) ........................................................................................................22, 25, 26

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017) ....................................................................................39, 40

*In re DBSD North America, Inc.*,
  634 F.3d 79 (2d Cir. 2011) .................................................................................52

**Page(s)**

*In re Dendreon Corp.*,
   No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) ..................................24, 42

*In re Edison Mission Energy*,
   No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013).........................................25

*In re Energy Future Holdings Corp. ("EFH I")*,
   904 F.3d 298 (3d Cir. 2018) ...........................................................................44, 45

*In re Exide Techs.*,
   607 F.3d 957 (3d Cir. 2010) ...................................................................29, 31, 32

*In re F/S Airlease II, Inc.*,
   844 F.2d 99 (3d Cir. 1988) ...........................................................................45, 46

*Fagan v. City of Vineland*,
   22 F.3d 1283 (3d Cir. 1994) ...............................................................................50

*In re Fed. Mogul Glob., Inc.*,
   293 B.R. 124 (D. Del. 2003).................................................................................25

*In re Genco Shipping & Trading Ltd.*,
   509 B.R. 455 (Bankr. S.D.N.Y. 2014).................................................................24

*Gov't Emps. Ret. Sys. of the Virgin Islands v. Gov't of the Virgin*
   *Islands*,
   995 F.3d 66 (3d Cir. 2021) ..................................................................................35

*In re Hercules Offshore, Inc.*,
   No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015) ........................................24

*In re Iridium Operating LLC*,
   478 F.3d 452 (2d Cir. 2007) ...............................................................................52

*In re Kaiser Grp. Int'l Inc.*,
   399 F.3d 558 (3d Cir. 2005) .........................................................................29, 51

*In re Kellstrom Indus., Inc.*,
   286 B.R. 833 (Bankr. D. Del. 2002)....................................................................31

*In re Klein Sleep Prods., Inc.*,
   78 F.3d 18 (2d Cir. 1996) ...................................................................................39

xiii

**Page(s)**

*In re Kmart Corp.*,
   359 F.3d 866 (7th Cir. 2004) ..............................................................53

*Lebron v. Mechem Financial Inc.*,
   27 F.3d 937 (3d Cir. 1994) ..............................................................38

*In re Lehman Bros. Holdings Inc.*,
   508 B.R. 283 (S.D.N.Y. 2014) ........................................................46

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*,
   756 F.2d 1043 (4th Cir. 1985) ........................................................31

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
   559 U.S. 229 (2010)........................................................................37

*In re Montgomery Ward Holding Corp.*,
   242 B.R. 147 (D. Del. 1999)...........................................................21

*Musacchio v. United States*,
   577 U.S. 237 (2016)........................................................................50

*In re Nat. Prods. Grp., LLC*,
   No. 10-10239, 2010 Bankr. LEXIS 5737 (Bankr. D. Del. Jan. 28,
   2010) ...............................................................................................40

*In re O'Brien Environmental Energy, Inc.*,
   181 F.3d 527 (3d Cir. 1999) ...............................................43, 44, 45

*In re Off. Prods. of Am., Inc.*,
   136 B.R. 675 (Bankr. W.D. Tex. 1992)...........................................46

*Pa. Dep't of Envtl. Res. v. Tri-State Clinical Laboratories, Inc.*,
   178 F.3d 685 (3d Cir. 1999) ...........................................................53

*In re Passa*,
   No. 2:18-cv-00006, 2019 WL 1435845 (D. Utah Mar. 29, 2019) ....................23

*In re Patterson*,
   119 B.R. 59 (E.D. Pa. 1990) .....................................................22, 34

**Page(s)**

*In re Philip Servs. (Delaware), Inc.*,
   284 B.R. 541 (Bankr. D. Del. 2002), *aff'd*, 303 B.R. 574 (D. Del.
   2003) .............................................................................................30, 31

*In re Pinnacle Brands, Inc.*,
   259 B.R. 46 (Bankr. D. Del. 2001) ....................................................38

*In re Purdue Pharma, L.P.*,
   No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) ........................24, 41, 49

*In re Quiksilver, Inc.*,
   No. 15-11880 (BLS), 2015 WL 13640498 (Bankr. D. Del. Oct. 28,
   2015) ..................................................................................................40

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ...........................................................................35

*In re RCS Capital Corp.*,
   Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016) .............42

*In re Reliant Energy Channelview LP*,
   594 F.3d 200 (3d Cir. 2010) .........................................................44, 45

*In re Robert L. Helms Constr. & Dev. Co.*,
   139 F.3d 702 (9th Cir. 1998) ..............................................................31

*In re Rural/Metro Corp.*,
   No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) .........................25

*Ryan v. Commodity Futures Trading Comm'n*,
   125 F.3d 1062 (7th Cir. 1997) ...........................................................23

*In re Safety-Kleen Corp.*,
   410 B.R. 164 (Bankr. D. Del. 2009) ...........................................29, 31

*In re Snowcrest Dev. Grp., Inc.*,
   200 B.R. 473 (Bankr. D. Mass. 1996) ...............................................46

*Speeney v. Rutgers*,
   369 F. App'x 357 (3d Cir. 2010) .......................................................50

**Page(s)**

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) ............................................................50

*In re Trans World Airlines, Inc.*,
    261 B.R. 103 (Bankr. D. Del. 2001)..................................................25

*In re Udell*,
    454 F.3d 180 (3d Cir. 2006) ............................................................36

*United States v. Bass*,
    404 U.S. 336 (1971)........................................................................35

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ..............................................................51

*In re Widmier*,
    No. 00-40244, 2003 WL 25273795 (Bankr. D. Idaho Nov. 18,
    2003) ...............................................................................................39

*In re Williams*,
    No. 10-11108, 2011 WL 2533046 (Bankr. D. Del. June 24, 2011) ...................39

## STATUTES

11 U.S.C., ch. 3 .............................................................................37

11 U.S.C., ch. 5 .............................................................................37

11 U.S.C. § 327(a) ........................................................................45

11 U.S.C. § 362 .............................................................................44

11 U.S.C. § 363 .......................................................................*passim*

11 U.S.C. § 363(b) ...................................................................*passim*

11 U.S.C. § 363(b)(1).....................................................................35

11 U.S.C. § 365 .......................................................................*passim*

11 U.S.C. § 365(a) ...................................................................*passim*

11 U.S.C. § 503.................................................................36, 37, 49

**Page(s)**

11 U.S.C. § 503(b) ................................................................................*passim*

11 U.S.C. § 503(b)(1).......................................................................45, 46

11 U.S.C. § 503(b)(1)(A) .................................................................39, 45

11 U.S.C. § 503(b)(2).......................................................................45, 46

11 U.S.C. § 503(b)(3)(D) .................................................................34, 36

11 U.S.C. § 503(b)(4)...........................................................................*passim*

11 U.S.C. § 1123 ......................................................................................44

11 U.S.C. § 1123(b)(6)...........................................................................46

11 U.S.C. § 1129 ......................................................................................51

11 U.S.C. § 1129(a) ................................................................................46

11 U.S.C. § 1129(b)(2)(B)(ii) ...............................................................51

### OTHER AUTHORITIES

Fed. R. Civ. P. 59(e).............................................................................44

**INTRODUCTION**

This is a unique bankruptcy proceeding.  Debtors commenced this proceeding to, among other things, comprehensively address their opioid exposure, including thousands of opioid-related lawsuits from states, municipalities, tribal governments, private parties, and others.  Negotiating individually with each of these entities would have been a non-starter.  Fortunately, the governmental opioid creditors organized into ad hoc committees that offered to assist Debtors in brokering a global settlement of their opioid liabilities and, along with a group of unsecured creditors who hold 84% of Debtors' outstanding guaranteed unsecured notes, ultimately entered into a restructuring support agreement ("RSA") incorporating this settlement.  As part of the RSA, Debtors agreed to seek court approval to pay the professionals who were essential in getting to that point and who would be essential in getting the restructuring plan to confirmation.

This appeal challenges the Bankruptcy Court's decision to allow Debtors to assume and/or enter into reimbursement agreements with those professionals, in order to maintain the benefit of the RSA and organized negotiating counterparties. The Bankruptcy Court granted such approval only after considering two rounds of briefing and hearings, making factual findings that Debtors had exercised sound business judgment and that the payments would be in the best interest of the estate, and imposing extensive safeguards to ensure that the payments would further the

1

interests of the estate and not merely the parochial interests of individual creditors. And in the ensuing four months since that decision, those professionals have worked tirelessly with Debtors to make progress on a complex restructuring plan—now on file with the Bankruptcy Court—that would have reached a standstill without them.

Although several interested groups filed objections in the Bankruptcy Court, the Acthar Plaintiffs[1] (who filed no objection to the initial fee motion) stand alone on appeal. The two official committees ultimately supported Debtors' motions— recognizing that the RSA and the work of the professionals is critical to pushing this restructuring to a successful resolution for all creditors. One group that objected below now supports the RSA and the payment of professional fees thereunder. And while the United States Trustee ("U.S. Trustee") seeks to participate as amicus, he presses only one of the litany of issues raised by the Acthar Plaintiffs.

Contrary to the U.S. Trustee's repeated use of the term "extra-statutory," the Bankruptcy Court granted relief under two statutory provisions: Sections 363(b) and

---

[1]   The "Acthar Plaintiffs" consist of the following: the City of Rockford ("Rockford"), Steamfitters Local Union No. 420 ("Steamfitters Local 420"), the International Union of Operating Engineers Local 542, United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("Plumbers Local 322") and Acument Global Technologies, individually and on behalf of the classes of third party payors and their beneficiaries that Rockford, Steamfitters Local 420 and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively.

365(a) of the Bankruptcy Code. There can be no meaningful dispute that both apply on their own terms. And the U.S. Trustee does not argue otherwise. The Acthar Plaintiffs, for their part, quibble about the "executory" nature of the pre-petition agreements, but they did not raise that argument below, it has nothing to do with Section 363(b), and it is meritless in any event.

The primary argument on appeal, then, is whether this Court should hold that Section 503(b), which allows a *creditor* to request *retrospective* payments of professional fees based on a "substantial contribution" test, somehow conflicts with Sections 363(b) and 365(a), which allow a *debtor* to request *prospective* payments of such fees or *assume* a pre-petition agreement based on a business judgment rule. No court has so held. And several courts have rejected this same argument. For good reason: these statutory provisions exist in separate sections of the Bankruptcy Code, apply to different parties, and serve fundamentally different purposes. The Bankruptcy Court was correct to apply Sections 363(b) and 365(a), and did not commit clear error in finding the business judgment and best interest of the estate standards satisfied.

This ruling was not only legally correct; it was critical to the success of these bankruptcy cases. It is hard to overstate how important the parties to the RSA and their professionals are to the success of this restructuring. The official committees understand that. The U.S. Trustee does not dispute that. And the Bankruptcy Court

3

found as much.  Any decision reversing the Bankruptcy Court would risk halting

and reversing the critical progress made thus far and would do so months after-the-

fact when final resolution is within reach.  This Court should affirm.

## STATEMENT OF THE ISSUE

Whether the Bankruptcy Court abused its discretion or otherwise erred in

permitting Debtors to assume and/or enter into reimbursement agreements to pay

certain reasonable professional fees and expenses of parties to a restructuring

support agreement based on factual findings that Debtors' decision to do so

represented an exercise of sound business judgment and that the payments were in

the best interest of the estate.

## STATEMENT OF THE CASE

On October 12, 2020, Debtors filed a Chapter 11 petition in the United States

Bankruptcy Court for the District of Delaware.  D.I. 1, 2.[2]  The filing was prompted

by unique circumstances.  Certain of the Debtors were defendants in over 3,000

opioid-related lawsuits filed in all 50 states and Puerto Rico.  App. 260, 1317.  And

Debtors had maintained over $1.6 billion in guaranteed unsecured note liabilities set

to come due starting in mid-2022.  App. 260; *see* App. 23-29.  Debtors were

---

[2]  "D.I." refers to the docket in the main Chapter 11 Case, Case No. 20-12522 (JTD).  "App." refers to pages in the Appellants' Appendix or Appellees' Supplemental Appendix.

4

ultimately able to negotiate and enter into an RSA with several of their key creditor communities.  App. 260-61; *see* App. 144-80.

Although significant work remains to be done, in the seven months since filing their Chapter 11 petitions, Debtors have made substantial progress toward a successful restructuring.  Debtors have now filed a plan of reorganization and discussions about how to allocate the consideration set aside for opioid claims under the RSA are progressing and Debtors expect them to reach a conclusion in the near term.  D.I. 2074.  This progress is due in large part to the support of the parties to the RSA ("RSA Parties").  And continuing support from those parties remains critical to the success of any plan.

Based on the importance of the RSA Parties (as holders of opioid claims and "fulcrum" funded debt claims) to the progress of their Chapter 11 cases generally, the significant benefits of having organized ad hoc groups with which to negotiate, and other considerations, Debtors moved for approval to pay the reasonable fees and expenses of the RSA Party professionals.  After two rounds of briefing and hearings, and after including safeguards to ensure that the scope of compensable work encompassed only activities that would benefit the estate and not merely the parochial interest of individual creditors, the Bankruptcy Court granted the relief sought under 11 U.S.C. §§ 363(b) and 365(a), finding that Debtors had a sound business purpose and that the payments were in the best interest of the estate.  This

appeal, by a single serial objector (which has appealed at least seven other orders in these Chapter 11 cases to date), followed.

## A.   Debtors' Engagement With The RSA Parties

In mid-2019, Debtors organized an ad hoc group of states and representatives of plaintiffs in the opioid multi-district litigation and initiated discussions with that group in the hope they could facilitate a global opioid-claim resolution.  App. 897, 1317.  The Governmental Plaintiff Ad Hoc Group agreed to work with Debtors to conduct diligence, and to negotiate and implement a global resolution of opioid-related claims through a Chapter 11 process, but sought assurances that the reasonable fees and expenses of their professional advisors would be reimbursed in undertaking this significant endeavor.  App. 897, 1317-19.  Debtors agreed and, on September 11, 2019, entered into a reimbursement agreement with these professionals.  App. 778-80, 805-14, 897.[3]

---

[3]   Under that agreement, Debtors agreed to pay the reasonable and documented fees and expenses of Gilbert LLP, Kramer Levin Naftalis & Frankel LLP, and Brown Rudnick LLP, each as legal counsel to the Governmental Plaintiff Ad Hoc Group, as well as the reasonable and documented expenses of the Group's members, in connection with "conducting diligence and negotiations regarding a settlement of claims against Mallinckrodt and in a potential implementation of such a settlement through a bankruptcy proceeding."  App. 805-14.  Debtors later entered into similar agreements relating to Houlihan Lokey Capital, Inc., as investment banker and financial advisor to the Group, App. 815-35 (October 17, 2019 agreement), and William Fry, as Irish counsel to the Group, App. 836-39 (February 25, 2020 agreement).  Debtors then agreed to provide retainers to the professionals, including Morris James LLP, which was retained as Delaware counsel.  App. 859-67 (October 7, 2020 agreement).

This reimbursement agreement was a key deal point.  State and local governments—*i.e.*, the plaintiffs in the 3,000 opioid-related lawsuits filed against Debtors—typically do not have funds earmarked to hire restructuring counsel for a complex financial and mass tort restructuring.  Due to the U.S. Trustee's policies, governmental creditors do not have their interests directly represented by estate-funded statutory committees during a Chapter 11 case.  App. 1397.  Debtors' decision to enter into the pre-petition reimbursement agreement made it possible for the Governmental Plaintiff Ad Hoc Group to organize behind experienced and competent advisors and negotiate with Debtors.

And this agreement bore fruit.  In February 2020, Debtors and the Governmental Plaintiff Ad Hoc Group agreed in principle on the terms of a settlement of opioid claims through a targeted bankruptcy filing involving only the company's generics business, which would leave its funded debt largely untouched.  App. 509, 1318.  By that time, the Governmental Plaintiff Ad Hoc Group had amassed support from attorneys general for 47 states and territories, as well as a court-appointed Plaintiffs' Executive Committee (the "PEC") in ongoing multi-district opioid litigation.  App. 509, 897-98.

The following month, however, adverse developments in litigation related to Debtors' Acthar medication necessitated a more comprehensive restructuring that would also reduce Debtors' funded debt (on which a substantially larger number of

7

Debtor entities were liable).  App. 9-11, 1319-20.  Debtors engaged with an ad hoc group of unsecured noteholders about a potential restructuring of senior guaranteed unsecured notes.  App. 897, 1320-21.  Like the Governmental Plaintiff Ad Hoc Group, this "Unsecured Notes Ad Hoc Group" agreed to work with Debtors, and sought assurance that the reasonable fees and expenses of its professionals would be reimbursed, as is customary in complicated financial restructurings.  App. 779-80, 897, 1321.  Debtors agreed and, on May 26, 2020, entered into a reimbursement agreement with those professionals.  App. 840-46.[4]

As Debtors and the Unsecured Notes Ad Hoc Group explored deleveraging options, Debtors and the Governmental Plaintiff Ad Hoc Group discussed the impact of Debtors' broader circumstances on the opioid settlement.  App. 897-98, 1321.  On October 11, 2020, Debtors and the two ad hoc groups entered into an RSA that incorporated a modified version of the February 2020 opioid-claims settlement and the terms of a Chapter 11 plan that would address Debtors' funded debt.  App. 144-

---

[4]   Under this reimbursement agreement, Debtors agreed to pay the reasonable and documented fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel to the Unsecured Notes Ad Hoc Group, in connection with a potential "refinancing or restructuring related" to the senior guaranteed unsecured notes.  App. 840-46.  Debtors later agreed to pay the reasonable fees and expenses of Perella Weinberg Partners LP, as financial advisor to the Group.  App. 847-58 (August 4, 2020 agreement).  A further reimbursement agreement with Irish counsel, regulatory counsel, and Delaware counsel was entered into post-petition.  App. 868-75.

80.  Due to the efforts of the RSA Parties, signatories to the RSA represented 50 state or territorial attorneys general, the PEC, and holders of 84% of the outstanding guaranteed unsecured notes.  App. 1321-22.  This unprecedented showing of support, and a heavily-negotiated path to exiting Chapter 11, demonstrated momentum going into Chapter 11 proceedings and inspired confidence in key partners and stakeholders.  App. 1322-23.

Before the petition date, Debtors were also in discussions with another group, the "Multi-State Governmental Entities Group" ("MSGE Group"), which represents over 1,300 entities including counties, cities, and other municipalities, as well as tribal nations and other public opioid claimants.  App. 1325.  In early November 2020, the momentum for Debtors' reorganization continued to build as the MSGE Group became the third group to join the RSA, agreeing to obtain commitments of support for the RSA from all of its constituents.  App. 514, 988, 1324-25.[5]  The MSGE Group similarly sought assurances that the reasonable fees and expenses of its professionals in connection with those efforts would be reimbursed.  App. 781,

---

[5]  By January 2021, the MSGE had succeeded as to "1,200 out of the approximately 1,300 entities."  App. 1325.

1325.  Debtors agreed, and a reimbursement agreement was entered into post-
petition.  App. 876-81.[6]

### B.    The Initial Fee Motion

To ensure the reimbursement agreements would, in fact, guarantee payment
post-petition, the RSA required an order granting Debtors authority to pay the RSA
Party professional fees be entered within 60 days of the petition date (*i.e.*, by
December 11, 2020).  App. 164, 1327, 1331.  On November 16, 2020, Debtors filed
a Motion For Order Authorizing Debtors To Pay The Reasonable And Documented
Fees And Expenses Of The RSA Party Professionals And Granting Related Relief
("Initial Fee Motion").  App. 258-382.  In that motion, Debtors sought authority to
perform their reimbursement obligations under Section 363(b) of the Bankruptcy
Code, but did not seek to assume or enter into any reimbursement agreements.  App.
278.

In support, Debtors filed a declaration from Randall Eisenberg, a Managing
Director at AlixPartners LLP, Debtors' restructuring consultant and financial
advisor.  App. 505-621.  In that declaration, Eisenberg explained that, "[a]bsent

---

[6]    Under this reimbursement agreement, Debtors agreed to pay the reasonable
and documented fees and expenses of Caplin & Drysdale, Chartered, as primary
counsel to the MSGE Group; Seitz, Van Ogtrop & Green, P.A., as Delaware counsel;
and FTI Consulting, Inc. as financial advisor, "in connection with their
representation of the MSGE Group in conducting diligence and negotiations
regarding a settlement of claims against Mallinckrodt and in implementation of such
a settlement through the Chapter 11 Cases."  App. 876-81.

assurance of payment for the reasonable fees and expenses arising from their professionals' engagement with the Debtors, the coordinated approach taken by the RSA Parties to date could erode or be abandoned altogether," which could force Debtors "to negotiate with numerous parties on a one-off basis or bring new advisors up to speed, creating tremendous inefficiency." App. 515. In particular, Eisenberg was concerned that the RSA Parties would abandon the RSA and their support for Debtors' reorganization absent assurances of payment. App. 515-16. And the risk of one or more parties abandoning the RSA was that "the trajectory of the Debtors' cases would become substantially more uncertain, the Debtors would likely spend substantially more time in bankruptcy (with correspondingly higher restructuring costs), and the Debtors' employees, vendors, and customers could lose confidence in the Debtors, harming the Debtors' business and potentially reducing the value of the enterprise." App. 515-16. Eisenberg concluded that "loss of RSA Party support would be detrimental not only to the Debtors, but to all creditors," and that "[t]he cost of the reasonable and documented fees and expenses of the RSA Parties will in all likelihood be meaningfully less than the potential loss of value should the RSA Parties abandon their coordinated engagement and support." App. 516.

On December 7, 2020, the Bankruptcy Court held a hearing on the Initial Fee Motion. App. 645-726. Four parties-in-interest had initially filed objections: (i) the U.S. Trustee; (ii) the "Ad Hoc First Lien Term Lender Group"; (iii) the official

11

committee of unsecured creditors ("UCC"); and (iv) the official committee of opioid claimants ("OCC").  The Acthar Plaintiffs—the only appellant before this Court— had not.  But at the hearing, they claimed to "concur and support" the U.S. Trustee's "objections."  App. 694.  The U.S. Trustee, in turn, had proffered only one objection. App. 383-99.  In his view, Section 503(b)(4) of the Bankruptcy Code was the exclusive means of reimbursing an unsecured creditor's professional fees and could only be applied retrospectively, after plan confirmation.  App. 390-95.

By the time of the hearing, the UCC and OCC had withdrawn their objections. App. 698, 710.  Counsel for both official committees instead expressed support for the relief requested.  App. 698, 712-13.  Although the UCC was "not on board with the RSA" and had "indicated [their] nonsupport for the RSA at every turn," App. 695-97, it nevertheless argued that relief should "be granted as a valid exercise of the debtors' business judgment," because the RSA provides the "forward momentum towards a solution that makes sense for [its] constituency" and because of a desire not "to see th[e] [RSA] parties veer off at the first exit from what might be a viable path towards a more global resolution."  App. 696-98.  Similarly, the OCC argued that "the case is better off with organized and important groups that have professionals and clients who feel comfortable that their professionals are getting paid on a current basis" and that "having these groups and professionals is the way

Chapter 11 works; it makes [the OCC's] job easier, it makes [the Bankruptcy Court's] job easier."  App. 712.

### C.    The Bankruptcy Court's Ruling On The Initial Fee Motion

In a December 14, 2020 bench ruling, the Bankruptcy Court denied the Initial Fee Motion without prejudice.   App. 727-66, 883-85.   The Bankruptcy Court recognized that "Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups."  App. 761.  And the court agreed that "[t]he ability to work with the ad hoc group[s] of creditors rather than trying to negotiate with vast numbers of individual creditors clearly provides for a more streamlined and convenient way to move toward completing a successful reorganization."  App. 756.  The court also emphasized that "payments could only be made for work that benefited the estate as a whole, not individual creditors," and that this standard was "not inconsistent with the rulings" in the Section 363(b) precedent Debtors had cited.  App. 761-63.  Applying that precedent, the court also set forth safeguards needed to ensure that any reimbursements would be in the best interest of the estate.  App. 762-63, 765.

But because "the debtors have chosen not to seek to assume the RSA or the reimbursement agreements[,]" the Bankruptcy Court concluded that it could not "determine whether it would be an exercise of the debtor's business judgment to enter into those agreements" and could not "evaluate whether making payments

pursuant to the terms of those agreements would, in fact, be in the best interest of the estates." App. 764-65.  In denying Debtors' motion without prejudice, the court left the door open for a renewed motion seeking to assume the existing, or enter into new, reimbursement agreements.  App. 765.

### D.     The Second Fee Motion

On December 30, 2020, Debtors filed a Motion To Assume And/Or Enter Into Reimbursement Agreements With RSA Party Professionals ("Second Fee Motion"). App. 767-882.  Consistent with the Bankruptcy Court's ruling, this time Debtors sought to pay the RSA Party professionals by (i) assuming the pre-petition reimbursement agreements under Section 365(a) of the Bankruptcy Code, and (ii) entering into post-petition reimbursement agreements under Section 363(b) with the RSA Parties with which they did not have executed pre-petition agreements.  *Id.*; App. 895-96.  Also consistent with the court's prior ruling, the proposed order contained additional limitations on the scope of permissible reimbursements:

- requiring that any reimbursable expenses be reasonable, documented, and reimbursable under the applicable reimbursement agreement;

- excluding reimbursement of fees incurred by an individual ad hoc group member for professionals retained by that member (including internal counsel);

- excluding reimbursement of fees and expenses of an individual ad hoc group member for filing objections to other creditors' claims or advancing or prosecuting the member's own claim;

- excluding reimbursement of fees and expenses incurred outside the scope of the reimbursement agreements or in connection with litigation against Debtors; and

- requiring reimbursement be subject to the interim compensation order.

App. 793-94, 798-804, 1526-33.  The reimbursement agreements were all included as exhibits.   App. 805-67, 868-81.   And Debtors submitted another Eisenberg declaration, reiterating and expanding on his prior testimony.  App. 893-982.

This time, the Acthar Plaintiffs filed their own objections.  App. 1002-1114. They also purported to join the objection filed by the U.S. Trustee which, again, rested on the argument that Section 503(b)(4) is the exclusive means of reimbursing an unsecured creditor's professional fees.  App. 1002-1114, 383-99.  The Ad Hoc First Lien Term Lender Group renewed their objections, which the Acthar Plaintiffs did not join or prosecute.   App. 1115-38.   And the UCC and OCC ultimately supported Debtors' Second Fee Motion as well, after accommodations were made to limit the scope of reimbursement to ensure benefit to the estate consistent with the Bankruptcy Court's prior ruling.  App. 1387-89, 1390-99.

On January 14, 2021, the Bankruptcy Court held a hearing on the Second Fee Motion.  App. 1305-1443.  Eisenberg testified and submitted to cross examination.  App. 1312-55.  Eisenberg reiterated his concern that the RSA Parties could abandon the RSA and their support for Debtors' reorganization absent assurances of payment.  App. 1324-31.  He emphasized the importance of organized ad hoc groups in "garner[ing] the support of the necessary" constituencies.  App. 1319-22, 1325.  And he made clear that the denial of the Initial Fee Motion had, as feared, stalled the progress of the cases, explaining that "we have come to a near halt in terms of the next[,] very most important phase of this case which is the allocation of opioid settlement proceeds."  App. 1327.  In response to questioning by counsel for the Acthar Plaintiffs, Eisenberg explained that, after the previous fee motion was denied, "debtors have not been able to make progress.  The plan had been to start the mediation immediately after that hearing and all of that has been on hold pending resolution of the professional fees going forward."  App. 1348.

### E.    The Bankruptcy Court Ruling On The Second Fee Motion

In a January 19, 2021 bench ruling, the Bankruptcy Court granted the Second Fee Motion with two modifications.  App. 1444-58.  The court found that Debtors had "met their burden of establishing the sound exercise of their business judgment under Sections 363 and 365 in assuming and/or entering into the reimbursement agreements with the professionals of the ad hoc groups at issue."  App. 1453-54.

16

The Bankruptcy Court also held that the motion and proposed order "complies with [its] previous ruling regarding what would be required for reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups" and "ensures that only reasonable and necessary fees will be paid."  App. 1454.  In particular, the court found that "good faith participation of the ad hoc groups in the mediation process is, in and of itself, beneficial to the debtors' estates as a whole," given "the unique nature of these cases, not just because of their size and complexity, but also because of the serious public health interests being addressed by this bankruptcy."  App. 1455.  Consistent with Eisenberg's unrebutted testimony, App. 1324-31, the court credited "Debtors['] concern[s], based on the comments and actions by the ad hoc groups, that they will not actively participate in the mediation if they cannot be reimbursed for the costs associated with that effort."  App. 1455.

In approving the order, the Bankruptcy Court imposed two additional requirements to further ensure that any reimbursements benefit the estate as a whole. "First, if the mediator informs the Court that the mediation has failed and there are no further prospects for proceeding with mediation, reimbursement of all fees and costs will cease, pending further order of the Court"; and, "[s]econd, if the mediator advises the Court that one or more of the ad hoc groups being reimbursed under this order are not acting in good faith in connection with the negotiations, then all

17

reimbursements to those identified parties will cease immediately pending further order of the Court, and any fees and expenses already paid will be subject to disgorgement following a hearing and an opportunity to be heard." App. 1455-56, 1495.

On February 9, 2021, the Bankruptcy Court entered Debtors' proposed order with those modifications. App. 1491-98 ("Fee Order").

### F.   Post-Fee Order Proceedings

Only the Acthar Plaintiffs appealed. But they did not seek a stay pending appeal or otherwise attempt to prevent reimbursement payments from being made while the appeal was pending. Debtors have accordingly paid millions to the RSA Party professionals under the terms of the Fee Order and the reimbursement agreements, and are likely to reimburse millions more before any disposition of this appeal. App. 1499-1514.

While this appeal has been pending, and with the help of the RSA Party professionals, Debtors have moved forward with their restructuring plan. On March 10, 2021, Debtors and the RSA Parties amended the RSA to, among other things, (i) add the Ad Hoc First Lien Term Lender Group (which had objected to entry of the Fee Order) as parties and settle all outstanding issues with them, D.I. 1631-1; and (ii) eliminate the threat of termination due to delay in entry of the Fee Order, *id.* at 12-13. The current RSA instead allows for termination if "the RSA Parties

Fee Order is reversed, stayed, or modified, on appeal or otherwise." *Id.* at 13. Mediation with the opioid claimants began shortly after the Fee Order was entered and is progressing toward a conclusion as of today's filing. And, on April 20, 2021, Debtors filed their restructuring plan with the Bankruptcy Court. D.I. 2074. A hearing to consider approval of Debtors' disclosure statement and procedures for soliciting votes on the plan is scheduled for May 26, 2021. D.I. 2076.

## SUMMARY OF THE ARGUMENT

The Bankruptcy Court correctly granted Debtors' motion under Sections 363(b) and 365(a) of the Bankruptcy Code. Section 363(b) allows a debtor (with court approval) to use estate property (here, cash) to enter into new agreements outside the ordinary course of business. Section 365(a) allows a debtor to assume and continue to perform under pre-petition agreements (also with court approval). Both statutory provisions impose a business judgment rule, whereby the Bankruptcy Court considers whether the debtor has exercised sound business judgment in determining that entry into, or assumption of, the agreements is in the best interest of the estate. After extensive briefing and hearings, the Bankruptcy Court found that the pre- and post-petition reimbursement agreements were in the best interest of the estate and, along with the imposition of detailed safeguards, approved the Fee Order. The Bankruptcy Court was correct to do so and neither the Acthar Plaintiffs' nor the U.S. Trustee's arguments to the contrary suggest otherwise.

*First*, the U.S. Trustee does not dispute that Sections 363(b) and 365(a) apply on their own terms.  Nor does he contest the applicable business judgment standard or argue it is not met here.  The Acthar Plaintiffs similarly have nothing to say about the applicability of Section 363(b).  And while they argue that Section 365(a) does not apply because the pre-petition reimbursement agreements are not sufficiently "executory," they did not make this argument below and it is meritless in any event.  The RSA Party professionals committed to work on behalf of their clients to negotiate and implement a restructuring, and Debtors agreed to pay their reasonable and documented fees and expenses for doing so.  That is enough.  And the Acthar Plaintiffs' cursory attempt to challenge the Bankruptcy Court's factual finding that Debtors satisfied the business judgment rule falls far short of proving clear error.

*Second*, the primary argument pressed by both the Acthar Plaintiffs and the U.S. Trustee fares no better.  This argument rests entirely on Section 503(b) and the "specific controls the general" canon of construction.  But Section 503(b) resides in a different chapter of the Bankruptcy Code, applies to different parties in different circumstances, and serves a different purpose.  Sections 363(b) and 365(a) allow a debtor to pay a creditor's professional fees on a prospective basis; Section 503(b)(4) allows a creditor to request professional fees on a retrospective basis.  There is no inherent contradiction or superfluity that could justify ignoring Section 363(b) and 365(a)'s plain language.  And if mere inclusion in Section 503(b) meant exclusion

from other statutory provisions, that would rework the traditional operation of the Bankruptcy Code in ways the U.S. Trustee does not try to defend. Which is why no court has agreed with the U.S. Trustee's position to date and why several courts have expressly rejected it. None of the case law cited by the Acthar Plaintiffs or the U.S. Trustee involves 363(b) or 365(a), and none compels a different outcome here.

*Third*, the Acthar Plaintiffs press additional arguments (not joined by the U.S. Trustee) that are, frankly, spurious. The law of the case doctrine does not bind the Bankruptcy Court to what was, at most, ambiguous dicta in its first bench ruling and, regardless, would not bind this Court on appeal. The absolute priority rule is a new argument not made by any objector below—which makes sense since it generally applies only to payments made under a Chapter 11 plan on account of a pre-petition claim (which the payments at issue are not) that favor junior creditors or equity holders (which the Acthar Plaintiffs are not). And the Acthar Plaintiffs' insinuations of criminal liability wrapped in a purported public policy objection are nonsense.

This Court should affirm.

## STANDARD OF REVIEW

"[W]ith respect to Section 363(b) motions . . . , the bankruptcy court has considerable discretion" and "may only be overturned on appeal if its decision was an abuse of discretion." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152-53 (D. Del. 1999). A bankruptcy court's determination under Section 363(b) or

365(a) that a debtor has satisfied the business judgment test by "articulat[ing] a reasonable basis for the business decision," in view of whether the transaction "is in the best interests of the estate," is a factual finding reviewed for "clear[] err[or]." *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016) (Section 363(b)), *aff'd*, 681 F. App'x 140 (3d Cir. 2017); *see In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) (Section 365(a)); *In re Patterson*, 119 B.R. 59, 60 (E.D. Pa. 1990) (same). Under the clear error standard, "[a] bankruptcy court's 'ultimate determination of fact' will not be set aside unless 'that determination is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *In re Culp*, 545 B.R. at 837 (citation omitted).  But on "questions of law," the reviewing court "exercises plenary review." *Id.*

## ARGUMENT

## I.   THE BANKRUPTCY COURT CORRECTLY GRANTED DEBTORS' MOTION UNDER SECTIONS 363(b) AND 365(a)

Sections 363(b) and 365(a) allow a debtor to enter into new, or assume existing, agreements to pay the professional fees of unsecured creditors so long as such payments are, in the debtor's business judgment, in the best interest of the estate and the Bankruptcy Court grants approval under that standard.  That is clear from the unambiguous text of the two statutory provisions, case law interpreting and applying them, and the policy interests furthered by affording a debtor latitude to

initiate transactions in the best interest of the estate.  The U.S. Trustee (seeking to participate only as amicus) does not dispute that Sections 363(b) and 365(a) apply on their own terms and are readily satisfied here.[7]  The Acthar Plaintiffs, for their part, make a single statutory argument that has been waived, does not apply to Section 363(b), and is wrong in any event.  And their disagreement with the Bankruptcy Court's factual findings comes nowhere close to proving clear error.

## A.    Sections 363(b) And 365(a) Apply And Are Satisfied

Under Section 363(b), a debtor-in-possession or "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b); *see id.* § 1107 (debtor-in-possession has the rights and powers of a trustee).  Under Section 365(a), the debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  *Id.* § 365(a).  Debtors filed a motion under Section 363(b) seeking court approval (*i.e.*, "after notice and a hearing") to "use" "property of the estate"

---

[7]    The U.S. Trustee filed objections as a party-in-interest below and could have appealed.  He did not.  There is at least a serious question whether a party that decided not to appeal should be permitted to file a brief long after the appeal deadline has expired purporting to be a "friend of the court."  *See In re Passa*, No. 2:18-cv-00006, 2019 WL 1435845, at *2 (D. Utah Mar. 29, 2019) ("[A] party can[not] sleep on his or her right to appeal a bankruptcy order, but still benefit by intervening in an appeal that was timely filed by another party . . . ."); *cf. Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J.) (suggesting amicus brief should not be allowed when the amicus is so "affected to entitle [him] to intervene and become a party in the present case").

(*i.e.*, cash) to enter into post-petition reimbursement agreements with some of the RSA Parties to pay certain professional fees and expenses that benefited the estate. Debtors similarly moved under Section 365(a) seeking "court[] approval" to "assume" pre-petition reimbursement agreements with other RSA Parties (*i.e.*, "executory contract[s]") to pay the same. The Bankruptcy Court thus correctly held that Sections 363(b) and 365(a) provide the "right 'procedural mechanism[s]'" through which Debtors may seek to pay the RSA Party professional fees and expenses on a prospective basis. App. 761, 1453-54.

Others courts have uniformly agreed. *See In re Bethlehem Steel Corp.*, No. 02 Civ. 2854, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) (affirming reimbursement under § 363(b) of creditor's professional fees "to help evaluate and negotiate the terms of a plan"); App. 2214-20 (Order, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019), [Doc. No. 553] ("*In re Purdue Pharma* Order")) (approving under §§ 363(b) and 365 payment of governmental plaintiff ad hoc committee's professional fees under reimbursement agreement); App. 1950-54 (Order, *In re Hercules Offshore, Inc.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015), [Doc. No. 95]) (approving under §§ 363 and 365 payment of unsecured creditors' professional fees as part of RSA assumption); App. 1828-1949 (Order, *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014), [Doc. No. 215] ("*In re Dendreon* Order")) (same); *In re Genco Shipping & Trading*

*Ltd.*, 509 B.R. 455, 460-63 (Bankr. S.D.N.Y. 2014) (same under § 365); App. 1632-37 (Order, *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013), [Doc. No. 217]) (same); App. 1628-1631 (Order, *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013), [Doc. No. 317]) (same); App. 1625-1624 (Order, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012), [Doc. No. 4652]) (similar under § 363).

The legal standard applicable to both Sections 363(b) and 365(a) is the business judgment test, under which a bankruptcy court will authorize debtor-initiated actions if a debtor shows that "a sound business purpose justifies" such actions. *In re Culp*, 545 B.R. at 844; *see In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (business judgment test applies to "debtor's use of assets outside the ordinary course of business" and "debtor's decision to [assume or] reject a contract" (citation omitted)). The test considers the benefit to the debtor's estate and, "[i]f a valid business justification exists, then a strong presumption follows that the agreement was negotiated in good faith and is in the best interests of the estate." *In re Culp*, 545 B.R. at 844. Indeed, "[w]here the [debtor-in-possession] articulates a reasonable basis for the business decision, courts will generally not entertain objections." *Id.*; *Armstrong World Indus.*, 348 B.R. at 162 (courts "uniformly defer[]" to the" debtor under Section 365(a)); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must

be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'"
(citation omitted)).

Applying that standard, the Bankruptcy Court "conclude[d] that the debtors
have met their burden of establishing the sound exercise of their business judgment
under Sections 363 and 365 in assuming and/or entering into the reimbursement
agreements with the professionals of the ad hoc groups at issue." App. 1453-54.
The court specifically "determined that the relief requested in the Motion is in the
best interests of the Debtors, their estates, their creditors, and other parties in
interest." App. 1492. And crediting "Debtors['] concern[s], based on the comments
and actions by the ad hoc groups, that they will not actively participate in the
mediation if they cannot be reimbursed for the costs associated with that effort," the
court found that the motion and proposed order "complies with . . . require[ments]
for reimbursements . . . in that it assures that the reimbursements will be for work
that benefits the debtors' estates as a whole, rather than individual creditors or
creditor groups" and "ensures that only reasonable and necessary fees will be paid."
App. 1454.

The Bankruptcy Court's factual findings were correct—and certainly were not
clearly erroneous. *See In re Culp*, 545 B.R. at 844. Debtors submitted ample
evidence that, without approval of the payments, ad hoc groups could have
disbanded and the RSA Party professionals might have declined to actively

26

participate in mediation regarding allocation of the fixed pool of opioid settlement consideration among governmental and private opioid claimants, a critical gating item for prosecuting the plan contemplated by the RSA.  App. 515, 1325-27.  More broadly, the Bankruptcy Court recognized that Debtors' continuing engagement and cooperation with the RSA Parties would be essential to a successful restructuring. App. 756, 1455.  As described above, Debtors' negotiations led to an RSA reflecting support from attorneys general for 50 (out of 56) U.S. states and territories (representing more than 95% of the national population), more than 1,300 municipalities, Indian tribes, and other public opioid claimants, and over 84% of the Debtors' fulcrum-funded debt securities.  App. 510-11, 903.  Piecemeal negotiation with thousands of states, municipalities, bondholders and others—rather than three organized ad hoc groups represented by experienced advisors—was simply not a feasible option.   Even the UCC and OCC, which did not support the RSA, understood the value of the organized ad hoc groups represented by the RSA Party professionals and supported the business justification for paying their fees.  App. 695-98, 712.  The record evidence precludes a finding of clear error.

**B.    The Acthar Plaintiffs' Arguments About Sections 363(b) and 365(a) Are Limited, Waived, And Meritless**

Neither the Acthar Plaintiffs nor the U.S. Trustee advance any argument that Section 363(b) does not apply by its own terms.  The U.S. Trustee also makes no argument as to how Section 365(a) could be deemed facially inapplicable.  Nor does

he argue that the Bankruptcy Court applied the wrong standard under those provisions, or misapplied the standard to the facts of this case. *See* U.S. Trustee Br. ("UST") 21 (recognizing "lenient business-judgment rule [is] typically applied to section 363 and 365 motions"). The Acthar Plaintiffs, alone, argue that Section 365(a) does not apply because the pre-petition reimbursement agreements are not "executory." And they also (briefly) suggest the Bankruptcy Court misapplied the governing standard. Neither argument holds up.

### 1. The "Executoriness" Argument Is Waived And Wrong

The Acthar Plaintiffs contend that the reimbursement agreements are not "executory contracts" and therefore cannot be assumed under Section 365(a). Opening Br. ("OB") 18-27. This issue has been waived, does not bear on the post-petition reimbursement agreements, and is without merit in any event.

The Acthar Plaintiffs never raised this issue in the Bankruptcy Court. They did not file objections to the Initial Fee Motion and, while they purported to "concur and support" the U.S. Trustee's objections during the hearing, the U.S. Trustee had not made any argument about the "executory" nature of the agreements. App. 694; *see* App. 383-99. The Acthar Plaintiffs then filed extensive objections to the Second Fee Motion, but never once questioned that the relevant agreements were executory. App. 1002-1114. And while they again purported to support the U.S. Trustee's objections, the U.S. Trustee did not raise this issue as to the Second Fee Motion

either.  App. 983-1001.  Only one objector pressed the "executory" issue—the First Lien Term Lender Group (which now supports the RSA and the payment of the RSA Party professional fees thereunder)—and the Acthar Plaintiffs never purported to join, or otherwise prosecute, their objections.  *See* App. 1115-38.  Because the Acthar Plaintiffs did not press the "executoriness" issue below, it should not be considered by this Court in the first instance.  *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 565 (3d Cir. 2005) (recognizing "the general rule that when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal").

In any event, the pre-petition reimbursement agreements are "executory" within the meaning of Section 365(a).  "An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) (citation omitted).  Put another way, the question is whether "obligation[s] . . . go to the very root of the parties' Agreement."  *Id.* at 964.  And "[c]ourts have ruled that contingent obligations under a contract are sufficient to render a contract executory when the contingent obligations are essential to the contract."  *In re Safety-Kleen Corp.*, 410 B.R. 164, 166-68 (Bankr. D. Del. 2009) (agreement to indemnify damages arising from pre-and-post-closing

environmental matters was executory); *In re Philip Servs. (Delaware), Inc.*, 284 B.R. 541, 550 (Bankr. D. Del. 2002) (similar), *aff'd*, 303 B.R. 574 (D. Del. 2003).

That understanding of "executoriness" is easily satisfied here.  As an initial matter, the Acthar Plaintiffs' new argument applies only to assumption of the *pre-petition* reimbursement agreements.[8]  And in each of those agreements, both parties have ongoing duties of performance during the pendency of the bankruptcy.  The RSA Party professionals committed to work on behalf of their clients to negotiate and implement a restructuring, and Debtors agreed to pay their reasonable and documented fees and expenses for doing so.  If the RSA Party professionals continue to provide the services contemplated by those agreements, Debtors must compensate them.  If the RSA Party professionals were to stop performing, Debtors would be relieved of their compensation obligations (and vice versa).

For example, in the agreement cited by the Acthar Plaintiffs, the RSA Party professionals agreed to conduct "diligence and negotiations regarding a settlement of claims against Mallinckrodt and in a potential implementation of such a settlement through a bankruptcy proceeding," and Debtors agreed to pay them for that work.  App. 807.  These "obligation[s] . . . go to the very root of the parties' Agreement,"

───────────────

[8]   Although the Acthar Plaintiffs appear to advance the same argument for the post-petition agreements (OB26), payment under those agreements would be made under Section 363(b), which makes no mention of "executory contracts." Regardless, those agreements are "executory" for the same reasons.

*In re Exide Techs.*, 607 F.3d at 964; they are "essential to the contract," *In re Safety-Kleen Corp.*, 410 B.R. at 168; and they were "still largely unperformed as of the date of the Petition since they were to last" throughout the bankruptcy, *In re Philip Servs.*, 284 B.R. at 549.

That the RSA Party professionals' obligations are framed in terms of the scope of payment does not change the analysis.  A contract is no less executory because one party can decide the extent to which it will exercise its contract rights.  *See, e.g.*, *In re Kellstrom Indus., Inc.*, 286 B.R. 833, 835 (Bankr. D. Del. 2002) (right of first refusal was executory because debtor was obligated "to sell to [the other contract party] if it matches the offer" and the other party was "required to exercise or waive the right"); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985).  At a minimum, such agreements are executory where (as here) "the [party with an option to perform] has announced that he is exercising the option, but [has] not yet followed through" in full.  *In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d 702, 706 (9th Cir. 1998).

At bottom, the purpose of the "executoriness" inquiry is to determine whether the "combination of assets and liabilities to the bankruptcy estate" that an executory contract comprises is a "net asset" which should be assumed, or a net liability which should be rejected.  *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 238 (3d Cir. 1995).  The reimbursement agreements at issue are undoubtedly a net asset given the

31

benefits to Debtors discussed above, and thus were properly assumed under Section 365(a).  To the extent there is any ambiguity, it could be easily fixed by amending the reimbursement agreements to include a commitment on the part of the RSA Party professionals to perform services within the scope of their mandates for so long as Debtors continue to perform thereunder.  And even without such an amendment, Debtors have authority under Section 363(b) to continue to perform under the pre-petition reimbursement agreements without assuming them.

The Acthar Plaintiffs' argument that "Debtors already have the benefit they sought," OB26, simply ignores the Bankruptcy Court's finding that the reimbursement agreements will provide ongoing benefits to the estate, including ensuring the RSA Party professionals' support in mediation and in the negotiation of numerous documents necessary to implement the restructuring.  *See supra* at 26-27.  And the Acthar Plaintiffs' heavy reliance on *In re Columbia Gas System* is misplaced for similar reasons.  The case concerned settlement agreements whereby "class members were entitled to receive their share of . . . escrow monies only after they executed a release of claims and a supplemental contract," which the court determined were "functionally ministerial duties" that "would [provide] nothing of value."  50 F.3d at 236-37, 243-44.  Here, the remaining "obligation[s] . . . go to the very root of the parties' [a]greement[s]," *In re Exide Techs.*, 607 F.3d at 964, and as

the Bankruptcy Court found, these agreements constitute a valuable "net asset," *Columbia Gas Sys.*, 50 F.3d at 238, whose assumption will benefit the estate.

### 2. The Bankruptcy Court Did Not Commit Clear Error In Finding The Business Judgment Rule Satisfied

The Acthar Plaintiffs also argue, almost in passing, that Debtors failed to satisfy the business judgment rule. OB37-38. They describe Debtors' concerns regarding a "loss of 'momentum'" as a "prophecy," and suggest that it was "poor business judgment" to agree to pay the RSA Party professional fees when they already had to pay "the official committees' professional fees" and when the RSA Party professionals can "terminate" the RSA for "Debtors having missed the December 2020 deadline." They are flat wrong.

As the Acthar Plaintiffs know, the official committees and ad hoc groups play very different roles in these cases. The official committees broadly advocate for the interests of the creditor constituencies they represent but, unlike the ad hoc groups, do not have authority to vote claims. They also are not (and do not include among their membership) governmental entities that can help broker broader consensus among other similarly situated public entities. And as the Acthar Plaintiffs also know, the RSA was amended in March 2021 to remove the December 2020 fee order milestone, such that the RSA Parties *cannot* terminate the RSA for failure to have met that deadline. D.I. 1631-1, at 12-13. Which leaves the Acthar Plaintiffs' unsupported belief that the failure to pay such fees would have no adverse impact

33

on the need to maintain forward momentum. Debtors produced record evidence to the contrary. App. 515-16, 1325-27. The RSA Parties agreed that the reimbursement agreements were critical. App. 435-48, 498-501, 622-26, 1249-70. So did both official committees. App. 696-98, 711-12. And, of course, the Bankruptcy Court made factual findings that the business judgment standard was satisfied. App. 1453-54, 1492, 1454-55. The Acthar Plaintiffs' baseless and unexplained disagreement with those findings falls far short of establishing clear error. *See In re Patterson*, 119 B.R. at 60.

## II. SECTION 503(b) DOES NOT APPLY OR OTHERWISE OVERRIDE SECTION 363(b) OR 365(a)

The primary argument on appeal—and the only one advanced by the U.S. Trustee as amicus—is about Section 503(b). Section 503(b)(4), the argument goes, addresses the payment of fees and expenses for professional services provided to a creditor and so Sections 363(b) and 365(a), despite their plain language, cannot do the same. Because Section 503(b)(3)(D)'s "substantial contribution" test is retrospective in nature, the argument continues, it cannot be applied before plan confirmation. And, according to the Acthar Plaintiffs, Debtors cannot satisfy the "substantial contribution" standard regardless. These arguments fail at every turn.

### A.    Section 503(b)(4) Does Not Override Section 363(b) Or 365(a)

The U.S. Trustee's entire argument rests on a single canon of construction: the notion that a specific statute controls over a more general statute. But as the

34

Supreme Court explained in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, "the general/specific canon" is applied either to "eliminate" a "contradiction" between two statutory provisions or to ensure that the general provision does not render the more specific provision "superflu[ous]." 566 U.S. 639, 645 (2012). Neither circumstance is presented here. There is no contradiction between Section 503(b), on the one hand, and Sections 363(b) and 365(a), on the other. Nor would applying Sections 363(b) and 365(a) according to their terms render Section 503(b)(4) superfluous. In these circumstances, a different canon of construction controls: "courts should interpret a statute with . . . an ear for harmonizing potentially discordant provisions." *Gov't Emps. Ret. Sys. of the Virgin Islands v. Gov't of the Virgin Islands*, 995 F.3d 66, 97 (3d Cir. 2021) (quoting *United States v. Bass*, 404 U.S. 336, 344 (1971)).

### 1.    There Is No Contradiction Or Superfluity

All three statutory provisions can be given effect without raising any contradiction or superfluity concerns. Sections 363(b) and 365(a), and Section 503(b), are directed at different parties, operate at different times, and serve different purposes. Sections 363(b) and 365(a) permit *debtors* (or trustees) to take actions for the benefit of the estate *going forward* based on their own *business judgment*. *See* 11 U.S.C. § 363(b)(1) (permitting "[t]he trustee, after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate");

35

*id.* § 365(a) (permitting "the trustee, subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor").  Section 503(b), in contrast, permits *creditors* (often over debtor objections) to seek allowance of an administrative expense for *past contributions* to an estate under a *substantial contribution* standard.  *See id.* § 503(b)(3)(D) (permitting claim after "a creditor . . . mak[es] a substantial contribution in a case under chapter 9 or 11 of this title").

Most of these distinctions stand undisputed.  The U.S. Trustee argues that Section 503(b) is "not limited to creditors or otherwise exclusive of the debtor" and "contains no reference to any applicant."  UST23.  But he cites no case in which a debtor has actually sought relief under Section 503(b) in similar circumstances.  And, regardless, statutory provisions do not have to be mutually exclusive for both to be given effect.  *See, e.g.*, *In re Udell*, 454 F.3d 180, 184-86 (3d Cir. 2006) (finding no conflict despite five-year "overlap" period during which two statutes apply, because "there is no overlap thereafter").  Even if debtors could theoretically seek retrospective relief under Section 503(b), it would be no great source of statutory tension if debtors could *also* seek authority to pay creditor professional fees under Section 363 or 365 during a case for purposes that benefit the estate on a prospective or ongoing basis.  And only the Acthar Plaintiffs even try suggest a superfluity problem.  But they never explain how "[a]llowing payment under §§ 363 and 365" could possibly "render[] § 503 superfluous."  OB36.  Among legions of

other applications, creditors cannot seek payment under Section 363(b) or 365(a). So Section 503(b) still has plenty of work to do.

The statutory structure confirms what the text suggests. Contrary to the U.S. Trustee's assertion that Sections 363(b) and 365(a) "exist side-by-side" with Section 503(b), UST18, the provisions are found in different chapters of the Bankruptcy Code. And the statutory placement underscores their distinct purposes: Sections 363(b) and 365(a) are found in Chapter 3, Subchapter IV, entitled "ADMINISTRATIVE POWERS," which relates to powers of the trustee, 11 U.S.C., ch. 3, subch. IV, whereas Section 503 is found in Chapter 5, Subchapter I the Bankruptcy Code, entitled "CREDITORS AND CLAIMS," 11 U.S.C., ch. 5, subch. I. The fact that Sections 363(b) and 365(a) relate to debtors and use of estate property, whereas Section 503(b) relates to creditors and allowance of administrative expense claims, is strong evidence that the latter's requirements were not intended to control in cases where a debtor is seeking relief to pay for ongoing work for the benefit of the estate. *Cf. Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252 (2010) (interpreting a statute "codified in a subchapter of the Bankruptcy Code entitled 'debtor's duties and benefits' . . . to govern advertisements aimed at creditors would be . . . anomalous" (citation omitted)).

And the Acthar Plaintiffs' policy arguments fall flat. They sound alarm bells about the potential to "sidestep the dictates of Section 503" via the deferential

37

business judgment standard in Sections 363(b) and 365(a).  OB36.  But it makes perfect sense that Congress would give debtors—who are duty-bound to maximize value for *all* parties-in-interest—wider latitude than creditors, whose role is often limited to advancing their own narrow interests.  As the Third Circuit explained in *Lebron v. Mechem Financial Inc.*, the Section 503(b) standard is directed at concerns that "the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests."  27 F.3d 937, 944 (3d Cir. 1994).  Those concerns do not extend (at least to the same degree) to a debtor-in-possession, which owes a fiduciary duty not to advantage one creditor to the detriment of the estate as a whole.  *See, e.g.*, *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del. 2001); *see also In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 12 (Bankr. S.D.N.Y. 2010) (recognizing that Section 503(b)'s "provisions are nonconsensual in nature" and "[b]y their terms, . . . do not require [the applicant to obtain] the assent or agreement of the debtor, chapter 11 trustee, or any other party").  That there are different standards for debtor-initiated relief and creditor-initiated relief is entirely sensible and provides no reason to ignore the plain and plainly applicable language of Sections 363(b) and 365(a).

### 2. Arguments To The Contrary Upset Settled Practice And Prove Too Much

The Acthar Plaintiffs and the U.S. Trustee argue that any types of payments covered by Section 503(b) cannot be approved under Section 363(b) or 365(a).  But

courts frequently authorize Debtors to pay expenses under Sections 363 and 365 that *are* of a type addressed in Section 503(b), without considering whether they comply with that section's requirements, as two examples illustrate.

*First*, professional fees like those at issue here have been authorized under Section 365 when they arise out of an assumed executory contract or lease. *See, e.g.*, *In re Williams*, No. 10-11108, 2011 WL 2533046, at *1 (Bankr. D. Del. June 24, 2011) (relating to "attorneys' fees incurred because of actions taken to enforce the underlying lease or contract"); *In re Widmier*, No. 00-40244, 2003 WL 25273795, at *3 (Bankr. D. Idaho Nov. 18, 2003) (after court authorizes assumption under § 365(a), damages—including attorney fees—arising from subsequent breach are not "subject to further limitation by § 503(b)(1)(A)"). These cases demonstrate that Section 503(b) is not the exclusive means for recovering professional fees.[9]

*Second*, vendor payments, wages, compensation and employee benefits, and other expenses are routinely authorized under Section 363(b) as "first-day" orders. *See generally Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985, 987 (2017). Although these expenses are of a type addressed in Section 503(b), *see, e.g.*, 11

---

[9]   Courts consistently hold that once an agreement is assumed under Section 365(a), all costs incurred by a debtor in performing the agreement (in this case, the payment of professional fees) are entitled to priority treatment as an administrative expense regardless of Section 503(b). *See, e.g.*, *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25-26 (2d Cir. 1996); *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1509 n.5 (11th Cir. 1985).

U.S.C. § 503(b)(1)(A) (allowing "administrative expenses" including "the actual, necessary costs and expenses of preserving the estate"), courts do not analyze or mention Section 503(b) when authorizing them.  *See, e.g.*, *In re Quiksilver, Inc.*, No. 15-11880 (BLS), 2015 WL 13640498, at *1 (Bankr. D. Del. Oct. 28, 2015) (critical vendors payments); *In re Nat. Prods. Grp., LLC*, No. 10-10239, 2010 Bankr. LEXIS 5737, at *1 (Bankr. D. Del. Jan. 28, 2010) (wages, compensation, and employee benefits).  For good reason, as Section 363(b) is designed to provide debtors with flexibility to use estate property in a way that benefits the estate and facilitates the reorganization.  *Cf. Czyzewski*, 137 S. Ct. at 985 ("distributions [must] 'enable a successful reorganization and make even the disfavored creditors better off'" (citation omitted).

Accepting the argument that expenses of a type addressed in Section 503(b) may *never* be authorized under Section 363(b) or 365(a) thus proves too much, and would undermine important bankruptcy policies and upend established practices. The disruption and harm to debtors and creditors that would result from this interpretation militate against it.

### 3. Courts Have Repeatedly Held That Section 503(b) Does Not Override Section 363(b) Or 365(a)

In courts throughout the country, the U.S. Trustee has advanced this same argument: that Section 503(b) overrides Section 363(b) or 365(a).  No court has

agreed. And several have expressly rejected the argument in highly analogous circumstances. The Bankruptcy Court correctly followed this on-point precedent.

In *In re Bethlehem Steel Corp.*, for example, the Southern District of New York held that "subsections 503(b)(3)(D) and (b)(4) do not bar a bankruptcy court from allowing a debtor in possession to reimburse a creditor for professional fees— provided, of course, that the standard for allowing transactions under § 363(b) has been met." 2003 WL 21738964, at *11. The court explained that "503(b)(3)(D) and (b)(4) are not rendered meaningless simply because in certain unique circumstances a bankruptcy court approves a debtor's motion to enter into an agreement to reimburse a creditor for professional fees," especially because "[i]n most cases, a debtor will make no such motion, as it will not be in its business interest to do so— or the court will refuse approval under § 363(b)." *Id.* And the court concluded that because, "in most cases, if a creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(D) and (b)(4)[,] [t]hose provisions continue to serve a purpose." *Id.*

More recently, with respect to another opioid-related bankruptcy filing, a bankruptcy court in New York applied the same reasoning to permit debtors to reimburse an ad hoc committee's professional fees under Sections 363(b) and 365(a). App. 2214-20 (*In re Purdue Pharma* Order); *see also* App. 2190 (*In re Purdue Pharma* Nov. 19, 2019 Hr'g Tr., [Doc. No. 550]). The debtors moved to

assume a reimbursement agreement and pay reasonable and documented fees under Sections 363(b) and 365(a).  App. 2215.  The U.S. Trustee objected, arguing that "the code has a more specific standard to pay the fees of an ad hoc committee and that would be under 503(b)(3)(d) and (4) which require the ad hoc committee to show a substantial contribution before their fees can be paid."  App. 2161-62.  Adopting the reasoning of *Bethlehem Steel*, the court disagreed and explained that "there are a number of . . . fact patterns under the Bankruptcy Code where Courts have approved payments of ongoing fees and expenses not under Section 503(b) but under Section 363(b) or sometimes under Section 365," including requests for approval of an RSA, legal fees of proposed bidders, and the fees and expenses of secured creditors even absent a showing that the creditor is sufficiently oversecured to be entitled to fees.  App. 2190-92.  As in those situations, the court concluded that the legal standards of Sections 363(b) and 365(a) applied and assessed "whether the entry into the agreement and the performance of it including the ongoing payment of the professional fees is a proper exercise of business judgement and in the best interest of the debtors and their estates and creditors."  App. 2192-93.

Other courts have held likewise.  App. 1828-1949 (*In re Dendreon* Order) (approving under §§ 363 and 365 professional fee payments over U.S. Trustee's objection); App. 1955-96 (Hr'g Tr., *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016), [Doc. No. 334]) ("I disagree with the United

42

States Trustee that I need to wait and see if the plan is confirmed before I can approve such [professional] fees.").

### 4.      The Contrary Case Law Cited Is Inapposite

The cases on which the Acthar Plaintiffs and the U.S. Trustee rely are inapposite.  None consider the interplay between 363(b) or 365(a) and 503(b).  Nor does their reasoning suggest a different result here.

The Acthar Plaintiffs and the U.S. Trustee rely primarily on a series of cases in which the Third Circuit affirmed a bankruptcy court's decision not to approve break-up fees under Section 503(b).  *In re O'Brien Environmental Energy, Inc.*, involved a break-up fee request by the unsuccessful bidder itself, which the bidder "originally captioned" as a "motion under 11 U.S.C. § 503(b)."  181 F.3d 527, 532 (3d Cir. 1999).  In the context of addressing the bidder's attempt to disclaim the only asserted statutory basis for relief, and recharacterize its "request" as one "made under the applicable case law," the court explained that there was no "support for the proposition that courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code" and "decline[d] the invitation to develop a general common law of break-up fees."  *Id.*  In so doing, the court emphasized that the filing of a petition for bankruptcy protection "precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code."  *Id.*  And, notably, the court cited Section 363 as one example

where the Bankruptcy Code *did* provide for such relief.  *Id.* (filing of Chapter 11 petition "precludes all efforts to obtain or distribute property of the estate other than as provided by the Bankruptcy Code, *see* 11 U.S.C. §§ 362, 363, 1123"). Accordingly, *O'Brien* was about whether a disappointed bidder could itself seek extra-statutory relief—not whether a debtor could seek relief under other *statutory* provisions.[10]

The U.S. Trustee cites two follow-on cases applying *O'Brien* (again, to break-up fees).  Neither addresses whether the debtor can seek such fees under Section 363(b) or 365(a), or says anything about the sort of professional fees at issue here. *In re Reliant Energy Channelview LP* simply applied the Section 503(b) standard to a unsuccessful bidder's application for a break-up fee.  594 F.3d 200, 206-09 (3d Cir. 2010).  And *In re Energy Future Holdings Corp. ("EFH I")* held only that the bankruptcy court did not violate Federal Rule of Civil Procedure 59(e) in

---

[10] Although the district court in *Bethlehem Steel* suggested that *O'Brien* could perhaps "be read as holding that § 503(b) is the only source for approval of the payment of [break-up] fees," it recognized that *O'Brien* was only about whether "an unsuccessful bidder can itself seek [such] payment . . . from the estate . . . under 503(b)."  2003 WL 21738964, at *9-10.  Indeed, the bidder in *O'Brien* had tried to appeal an earlier ruling by the bankruptcy court denying *the debtor's* motion for approval of a break-up fee, which the "Bankruptcy Court refused . . . [due to] concern that allowing such fees and expenses would 'perhaps chill or at best certainly complicate the competitive bidding process.'"  181 F.3d at 529.  But the Third Circuit held the bidder "lack[ed] standing to appeal [that] order."  *Id.* at 531. *O'Brien* thus specifically refused to consider whether the debtor had authority to seek break-up fees under Section 363(b).

reconsidering its earlier break-up fee decision that was based on a mistake of fact. 904 F.3d 298, 314-16 (3d Cir. 2018).  Neither case purported to expand the holding or reasoning of *O'Brien*.  And neither applied *O'Brien* outside the context of break-up fees.  Other courts have declined to extend the reasoning of *O'Brien* even to relatively analogous circumstances like bidders' "due diligence reimbursement fees," which can "be reimbursed regardless of whether the [bidders] were ultimately successful."  *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (distinguishing *O'Brien* and *Reliant* as "appl[ying] section 503(b) and not 363(b)" and involving "break-up fees [that] were to be paid only if the prospective bidder was unsuccessful").

The U.S. Trustee also cites *In re F/S Airlease II, Inc.*, 844 F.2d 99, 108 (3d Cir. 1988).  There, the Third Circuit refused to allow a professional to recover fees under Section 503(b)(1)(A) when he was ineligible to recover the same fees under the neighboring provision, Section 503(b)(2), because he failed to comply with a necessary precondition to recovery.  The court explained that "section 327(a)" puts requirements on the "authority to pay administrative expenses for [trustee-employed] professionals" under Section 503(b)(2).  *Id.* at 108.  The professional had failed to obtain prior approval as required under Section 327(a), despite being "a sophisticated businessman who was represented by attorneys."  *Id.* at 106-08.  Which is why he sought relief under Section 503(b)(1) instead.  That the court refused to

read two provisions (503(b)(1) and (b)(2)) that actually do "exist side-by-side" (UST18) as covering precisely the same expenses in a way that would allow professionals to circumvent a critical statutory pre-approval requirement designed to ensure that they are not compromised by adverse interests before working for the estate is not surprising.  But it has little to do with this case.[11]

And, finally, the Acthar Plaintiffs rely on the Southern District of New York's decision in *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283 (S.D.N.Y. 2014).  There, the court refused to allow individual members of an official creditors committee to rely on Sections 1123(b)(6) and 1129(a), instead of Section 503(b), to recover expenses on a retrospective basis, as part of a plan of reorganization.  508 B.R. at 288-89, 293.  The court explained that Section 503(b) expressly prohibited such payments absent the necessary "substantial contribution," and that parties could not effectively contract around that prohibition by agreeing to include the payments in the plan itself.  *Id.* at 289-94.  *Lehman Brothers* thus focused on retrospective payments expressly prohibited by Section 503(b); it did not cast doubt on *Bethlehem Steel*, a decision by the same court, 11 years prior, that (unlike *Lehman Brothers*) is directly on point.

---

[11]   The Acthar Plaintiffs cite two out-of-circuit cases that stand for the same general principle as *F/S Airlease* and are distinguishable for the same reasons.  *See In re Snowcrest Dev. Grp., Inc.*, 200 B.R. 473, 479 (Bankr. D. Mass. 1996); *In re Off. Prods. of Am., Inc.*, 136 B.R. 675, 686-87 (Bankr. W.D. Tex. 1992).

### B.    Section 503(b)'s Substantial Contribution Test Is Inapplicable

The Acthar Plaintiffs spend pages arguing that Debtors failed to satisfy Section 503(b)'s "substantial contribution" test.  OB45-50.  To the extent they argue that Section 503(b) is retrospective only and could not have been satisfied when the Debtors brought the Initial Fee Motion at the outset of these cases, Debtors agree. But that just gets back to whether Section 503(b) overrides the prospective options available to Debtors under Sections 363(b) and 365(a).  To the extent the Acthar Plaintiffs are instead making a record-based argument about whether the reimbursement agreements actually further the interests of the estate, they cannot overcome the Bankruptcy Court's findings for the reasons set forth above.

To be clear, Debtors do not believe that Section 503(b)'s substantial contribution standard has any role to play when assessing compliance with Section 363(b) or 365(a).  But the business judgment rule, which does apply, considers whether entering into post-petition reimbursement agreements, or assuming pre-petition reimbursement agreements, is in the best interest of the estate.  As the district court explained in *Bethlehem Steel*, "Section 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor.  If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b)." 2003 WL 21738964, at *10.  That is the standard the Bankruptcy Court applied and found satisfied here.  *See, e.g.*,

App. 1454 (proposed order "complies with [court's] previous ruling regarding what would be required for reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups").  All of the Acthar Plaintiffs' arguments under the "substantial contribution" heading either apply the wrong standard or just quibble with the Bankruptcy Court's factual findings.[12]

## III.   THE ACTHAR PLAINTIFFS' REMAINING ARGUMENTS ARE SPURIOUS

The Acthar Plaintiffs' remaining arguments, which the U.S. Trustee does not advance, are patently spurious.

*First*, the Acthar Plaintiffs invoke the law of the case doctrine to argue that the Bankruptcy Court was required to apply Section 503(b) and its "substantial contribution" standard in ruling on the Second Fee Motion.  OB28-31, 41-42.  This argument is flawed several times over.

---

[12]  For example, the Acthar Plaintiffs suggest the Bankruptcy Court "assum[ed], without evidence, that participation in mediation will in some way materially enhance the recovery to other creditors."  OB44.  But they do not address the unrebutted evidence: the uncertainty, loss of confidence, and likely need to "spend substantially more time in bankruptcy (with correspondingly higher restructuring costs)," all support the finding that "loss of RSA Party support would be detrimental not only to the Debtors, but to all creditors."  App. 515-16.  Similarly, the assertion that "the mediation benefitted only those participating in it," OB47 (emphasis omitted), ignores the Bankruptcy Court's contrary findings.  App. 1454-55.

As an initial matter, the Acthar Plaintiffs misread the Bankruptcy Court's interim bench ruling on the Initial Fee Motion. The court never said that "that 11 U.S.C. § 503 controlled." OB41 (citing App. 727-66). If that had been its holding, there would have been no reason to deny the motion *without prejudice*. Nor would the court's explicit ruling that "Section 363 provides the procedural mechanism" for the relief sought make sense. App. 761. Rather, the court clearly allowed Debtors to renew their request under Section 363(b) or 365(a) after entering into new reimbursement agreements and/or assuming the pre-petition reimbursement agreements. App. 765. And while there may have been some ambiguity as to what standard the court would apply to that renewed motion, any discussion of the standard was dicta, and the better reading is that the court would apply the business judgment standard, which looks to whether the relief requested is in the best interest of the estate. *See* App. 764 (explaining that, because the agreements were not assumed, the court "cannot determine whether it would be an exercise of the debtor's business judgment to enter into those agreements"); App. 761 ("This is not inconsistent with the rulings by Judge Drain in *Purdue* and the District Court's decision in *Bethlehem Steel*."). *But see id.* (referring to Section 503 and the "substantial contribution" test). Which is exactly what the court did in granting the Second Fee Motion. App. 1454 (concluding that the motion and proposed order "complies with [its] previous ruling regarding what would be required for

49

reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups").

But even if this Court reads the first bench ruling differently, it does not matter. The law of the case doctrine binds litigants; it does not limit a court's power. *See Speeney v. Rutgers*, 369 F. App'x 357, 359 (3d Cir. 2010) ("The law of the case . . . is a discretionary doctrine" that "is not a restriction on the court's power." (citation omitted)). It does not apply to "ambiguous ruling[s]" or dicta. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 988 F.2d 414, 429-30 (3d Cir. 1993). And regardless, an incorrect, interim ruling could never bind this Court on appeal. *See Musacchio v. United States*, 577 U.S. 237, 245 (2016) ("An appellate court's function *is* to revisit matters decided in the trial court. . . . . [I]t is not bound by district court rulings under the law-of-the-case doctrine."). Indeed, an appellate court can affirm a lower court's decision on any ground apparent in the record. *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019).

*Second*, the Acthar Plaintiffs argue that the payments authorized violate the absolute priority rule. OB50-54. This is a new argument that nobody raised before the Bankruptcy Court. It is therefore waived. *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d at 565. But it is also incorrect.

50

For starters, the argument is misplaced because the payments are not being made under any Chapter 11 plan or on account of claims or interests junior to the Acthar Plaintiffs. The absolute priority rule is codified in Section 1129, which addresses when a "court shall confirm a plan" of reorganization and establishes requirements for confirmation. 11 U.S.C. § 1129. And it applies only in a "cram down" situation in which a non-consensual plan is confirmed over the objections of an impaired class, and junior creditors (or interest holders) are recovering under the plan. *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005). In those limited circumstances, the rule requires that "the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property." *Id.* (alteration in original) (quoting 11 U.S.C. § 1129(b)(2)(B)(ii)). The payments here would not advantage any pre-petition opioid claimants on account of claims that are *junior* to the claims of the Acthar Plaintiffs; the RSA Parties and the Acthar Plaintiffs are in the same class of general unsecured creditors and, in the case of opioid creditors, creditors of different Debtors. And regardless, because the plan confirmation hearing has not yet occurred and no plan is before this Court, the Acthar Plaintiffs' argument is inapt. *See In re W.R. Grace & Co.*, 475 B.R. 34, 175 (D. Del. 2012) ("The absolute priority rule . . . only applies to confirmation of a plan").

51

The Acthar Plaintiffs contend that "the absolute priority rule is not restricted simply to plan confirmation." OB52. But the only two cases they cite provide no support. *In re DBSD North America, Inc.* made clear that the "gift" at issue was provided for "under the plan." 634 F.3d 79, 95-96 (2d Cir. 2011). And *In re Iridium Operating LLC* recognized that "[w]hen a settlement is presented for court approval *apart from a reorganization plan*," the absolute priority rule "is not necessarily implicated" and that "[i]t is difficult to employ the rule of priorities" in that instance because "the nature and extent of the Estate and the claims against it are not yet fully resolved." 478 F.3d 452, 463-64 (2d Cir. 2007) (emphasis added). The court affirmed the transfer of estate funds to a litigation trust, without analyzing the rule, *id.* at 466, but remanded on the narrower issue of whether any remaining funds in the trust could be distributed to unsecured creditors, because "no reason ha[d] been offered to explain" that distribution. *Id.* Here, the payments do not settle underlying unsecured claims (of the RSA Parties or otherwise) and Debtors and the Bankruptcy Court adequately explained the need for the payments.

*Finally*, the Acthar Plaintiffs make unfounded and inappropriate allegations of criminal fraud in arguing that the Bankruptcy Court's order violates public policy. OB55-58. These arguments are absurd on their face. In drafting the Bankruptcy Code, "Congress recognized th[e] need to provide an incentive to creditors who otherwise would not continue to provide services to a failing business." *Pa. Dep't*

*of Envtl. Res. v. Tri-State Clinical Laboratories, Inc.*, 178 F.3d 685, 690 (3d Cir. 1999).  Far from being against public policy (let alone criminally fraudulent), the reimbursement agreements merely reflect the RSA Parties' (and their professionals') need for assurance that their substantial efforts supporting the RSA and eventual plan of reorganization would not go uncompensated.  *Cf. In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004) ("The foundation of a critical-vendors order is the belief that vendors not paid for prior deliveries will refuse to make new ones.").  For the reasons discussed, the Bankruptcy Code permits Debtors to give that assurance where, as here, they demonstrate a sound business purpose and the payments are in the best interest of the estate.

53

## CONCLUSION

For the foregoing reasons, this Court should affirm.

May 14, 2021                        Respectfully submitted,
Wilmington, Delaware

/s/ Michael J. Merchant            Melissa Arbus Sherry (*pro hac vice*)
Mark D. Collins (No. 2981)         James A. Tomberlin (*pro hac vice*)
Michael J. Merchant (No. 3854)     Andrew Sorkin (*pro hac vice*)
Amanda R. Steele (No. 5530)        **LATHAM & WATKINS LLP**
Brendan J. Schlauch (No. 6115)     555 Eleventh Street, NW, Suite 1000
**RICHARDS, LAYTON & FINGER,**     Washington, DC 20004
**P.A.**                           (202) 637-2200
One Rodney Square                  melissa.sherry@lw.com
920 N. King Street                 james.tomberlin@lw.com
Wilmington, Delaware 19801         andrew.sorkin@lw.com
(302) 651-7700
collins@rlf.com                    George A. Davis (*pro hac vice*)
merchant@rlf.com                   George Klidonas (*pro hac vice*)
steele@rlf.com                     Anupama Yerramalli (*pro hac vice*)
schlauch@rlf.com                   885 Third Avenue
                                   New York, New York 10022
                                   (212) 906-1200
                                   george.davis@lw.com
                                   george.klidonas@lw.com
                                   anu.yerramalli@lw.com

                                   Jeffrey E. Bjork (*pro hac vice*)
                                   355 South Grand Avenue, Suite 100
                                   Los Angeles, California 90071
                                   (213) 485-1234
                                   jeff.bjork@lw.com

54

Jason B. Gott (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com


*Counsel for Debtors-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains 12,990 words, excluding the parts exempted by Federal Rule of Bankruptcy Procedure 8015(g), as counted by Microsoft Word.

I hereby certify that this document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Michael J. Merchant*
Michael J. Merchant