IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re MALLINCKRODT PLC, *et al*., | : | Chapter 11 |
| | : | Bankr. Case No. 20-12522-JTD |
| Debtors. | : | (Jointly Administered) |
| | : | |
| CITY OF ROCKFORD, *et al*., | : | |
| | : | |
| Appellants, | : | |
| v. | : | Civ. No. 21-167-LPS |
| | : | |
| MALLINCKRODT PLC, *et al.,* | : | |
| | : | |
| Appellees. | : | |

## <u>MEMORANDUM OPINION</u>

## I.       INTRODUCTION

Pending before the Court is an appeal (D.I. 1) by the Acthar Plaintiffs[1] from the

Bankruptcy Court's February 1, 2021 *Order Authorizing the Debtors to Assume and/or Enter*

*Into Reimbursement Agreements with RSA Parties' Professionals* (B.D.I. 1250) (APP1491-

1498)[2] ("Fee Order"), entered in the chapter 11 cases of debtor Mallinckrodt PLC

("Mallinckrodt") and certain of its affiliates (together, "Debtors"), which approved the Debtors'

---

[1] The "Acthar Plaintiffs" consist of the following: the City of Rockford ("Rockford"), Steamfitters Local Union No. 420 ("Steamfitters Local 420"), the International Union of Operating Engineers Local 542 ("IUOE Local 542"), United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey ("Plumbers Local 322"), and Acument Global Technologies ("Acument"), individually and on behalf of the classes of third-party payors ("TPPs") and their beneficiaries that Rockford, Steamfitters Local 420, and Plumbers Local 322 seek to represent in their respective cases currently pending in federal district courts in the Northern District of Illinois, the Eastern District of Pennsylvania, and the District of New Jersey, respectively.

[2] The docket of the Chapter 11 cases, captioned *In re Mallinckrodt, plc, et al*., No.  20-12522-JTD (Bankr. D. Del.), is cited herein as "B.D.I. __."  The appendices filed in support of Acthar Plaintiffs' opening brief (D.I. 13) and the Debtors' answering brief (D.I. 18) are cited herein as "App. __."

motion for order, pursuant to 11 U.S.C. §§ 363 and 365(a), "authorizing but not directing [Debtors] to pay the reasonable and documented fees and expenses" of certain professionals retained by certain parties to a restructuring support agreement. The Office of the United States Trustee ("UST") has filed an *amicus curiae* brief in support of reversal of the Fee Order. (D.I. 15) For the reasons that follow, the Court will affirm the Fee Order.

## II.    BACKGROUND

### A.    The Chapter 11 Cases

On October 12, 2020, Debtors filed voluntary petitions seeking chapter 11 bankruptcy relief. (B.D.I. 1, 2) Mallinckrodt's filing was precipitated by opioid-related and other litigation. (App. 260, 1317-19) Three groups of creditors formed non-statutory ad hoc groups to negotiate possible settlements with Mallinckrodt: (1) the Governmental Plaintiff Ad Hoc Committee, representing states and U.S. territories holding opioid claims (App. 261-62); (2) the Unsecured Notes Ad Hoc Group, consisting of holders of Mallinckrodt's guaranteed unsecured notes (App. 261-62); and (3) the Multi-State Governmental Entities Group ("MSGE Group"), consisting of local governmental entities with opioid-related claims (App. 262, 1339).

Prior to filing its petition, Mallinckrodt entered into a restructuring support agreement ("RSA") with the Governmental Plaintiff Ad Hoc Committee and the Unsecured Notes Ad Hoc Group. The MSGE Group later joined the RSA. (App. 262-63; *see also* B.D.I. 505) Among other things, the RSA outlined the main terms for a proposed chapter 11 plan of reorganization. (App. 261-62; *see also* App. 145-79)

The Governmental Plaintiff Ad Hoc Committee, the Unsecured Notes Ad Hoc Group, and the MSGE Group (collectively, the "RSA Parties") committed to either voting in favor of, or recommending to their members that they vote in favor of, Debtors' proposed plan. (App. 263)

In turn, Debtors agreed to pay "all reasonable and documented fees and out-of-pocket expenses" of certain professionals retained by the RSA Parties, including attorneys, investment bankers, and financial advisors ("RSA Professionals") and gave each RSA Party the right to terminate the RSA if Debtors failed to meet their obligations.  (App. 267-74, 164, 178-79; B.D.I. 505 at 4)

### B.    The Initial Fee Motion

The RSA required an order granting Debtors authority to pay the RSA Party professional fees be entered within 60 days of the petition date (i.e., by December 11, 2020).  (App. 164, 1327, 1331)  On November 16, 2020, Debtors moved for an order "authorizing but not directing [Debtors] to pay the reasonable and documented fees and expenses of the RSA Party Professionals."  (App. 258-382) ("Initial Fee Motion")  In the Initial Fee Motion, Debtors sought authority to perform their reimbursement obligations under § 363(b) of the Bankruptcy Code – which allows a debtor-in-possession to use estate property outside of the ordinary course of business, with court approval – but did not seek authority to assume or enter into any reimbursement agreements.  (App. 274)

In support of the Initial Fee Motion, Debtors filed a declaration from Randall Eisenberg, a Managing Director at AlixPartners LLP, Debtors' restructuring consultant and financial advisor.  (App. 505-621)  Eisenberg explained that, "[a]bsent assurance of payment for the reasonable fees and expenses arising from their professionals' engagement with the Debtors, the coordinated approach taken by the RSA Parties to date could erode or be abandoned altogether," which could force Debtors "to negotiate with numerous parties on a one-off basis or bring new advisors up to speed, creating tremendous inefficiency."  (App. 515)  In particular, Eisenberg was concerned that the RSA Parties would abandon the RSA and their support for Debtors' reorganization without assurances of payment.  (App. 515-16)  Eisenberg declared that the risk

3

of one or more parties abandoning the RSA was that "the trajectory of the Debtors' cases would become substantially more uncertain, the Debtors would likely spend substantially more time in bankruptcy (with correspondingly higher restructuring costs), and the Debtors' employees, vendors, and customers could lose confidence in the Debtors, harming the Debtors' business and potentially reducing the value of the enterprise."  (App. 515-16)  Eisenberg concluded that "loss of RSA Party support would be detrimental not only to the Debtors, but to all creditors," and that "[t]he cost of the reasonable and documented fees and expenses of the RSA Parties will in all likelihood be meaningfully less than the potential loss of value should the RSA Parties abandon their coordinated engagement and support."  (App. 516)

Four parties-in-interest filed objections to the Initial Fee Motion: (i) the UST (App. 383-99); (ii) the "Ad Hoc First Lien Term Lender Group;" (iii) the official committee of unsecured creditors ("UCC"); and (iv) the official committee of opioid claimants ("OCC").  The UST proffered only one objection: in the UST's view, § 503(b)(4) of the Bankruptcy Code was the exclusive means of reimbursing an unsecured creditor's professional fees and could only be applied retrospectively, after plan confirmation.  (App. 390-95)  The Acthar Plaintiffs – the only Appellants before this Court – filed no objection, but, at the hearing, the Acthar Plaintiffs represented that they "concur[red] and support[ed]" the UST's "objections."  (App. 694)  In reply, Debtors argued that their request fell outside the scope of § 503, and was properly made under § 363(b) because the Debtors sought prospective authority to pay expenses, as opposed to a creditor seeking after-the-fact reimbursement.  (App. 458-59)

On December 7, 2020, the Bankruptcy Court held a hearing on the Initial Fee Motion. (App. 645-26)  By the time of the hearing, the UCC and OCC had withdrawn their objections. (App. 698, 710)  Instead, counsel for both official committees expressed support for the relief

requested.  (App. 698, 712-13)  Although the UCC was "not on board with the RSA" and had "indicated [their] nonsupport for the RSA at every turn" (App. 695-97), it nevertheless argued that relief should "be granted as a valid exercise of the debtors' business judgment," because the RSA provides the "forward momentum towards a solution that makes sense for [its] constituency" and because of a desire not "to see th[e] [RSA] parties veer off at the first exit from what might be a viable path towards a more global resolution."  (App. 696-98)  The OCC similarly asserted that "the case is better off with organized and important groups that have professionals and clients who feel comfortable that their professionals are getting paid on a current basis" and that "having these groups and professionals is the way Chapter 11 works; it makes [the OCC's] job easier, it makes [the Bankruptcy Court's] job easier."  (App. 712)

In a December 14, 2020 bench ruling, the Bankruptcy Court denied the Initial Fee Motion without prejudice.  (App. 727-66, 883-85)  The Bankruptcy Court recognized that "Section 363 provides the procedural mechanism for a debtor to seek the authority to make payments to unsecured creditor groups" (App. 761) and agreed that "[t]he ability to work with the ad hoc group[s] of creditors rather than trying to negotiate with vast numbers of individual creditors clearly provides for a more streamlined and convenient way to move toward completing a successful reorganization."  (App. 756)  The Bankruptcy Court also emphasized that "payments could only be made for work that benefited the estate as a whole, not individual creditors," and that this standard was "not inconsistent with the rulings" in the § 363(b) precedent Debtors had cited.  (App. 761-63)  Applying that precedent, the Bankruptcy Court noted safeguards were needed to ensure that any reimbursements would be in the best interest of the estate.  (App. 762-63, 765)  But because "the debtors have chosen not to seek to assume the RSA or the reimbursement agreements," the Bankruptcy Court could not "determine whether it would be an

exercise of the debtor's business judgment to enter into those agreements," and could not "evaluate whether making payments pursuant to the terms of those agreements would, in fact, be in the best interest of the estates."  (App. 764-65)  In denying Debtors' motion without prejudice, however, the Bankruptcy Court left the door open for a renewed motion seeking to assume the existing, or enter into new, reimbursement agreements.  (App. 765) (denying Debtors' Initial Fee Motion "without prejudice to [their] ability to seek to assume the RSA or the reimbursement agreements or some other post-petition reimbursement agreement entered into with the ad hoc groups" or to creditor groups' ability to seek reimbursement under § 503(b).

### C.    Second Fee Motion

On December 30, 2020, Debtors filed a *Motion to Assume and/or Enter into Reimbursement Agreements with RSA Party Professionals*.  (App. 767-882) ("Second Fee Motion")  Consistent with the Bankruptcy Court's prior ruling, Debtors sought to pay the RSA Party professionals by (i) assuming the pre-petition reimbursement agreements under § 365(a) of the Bankruptcy Code, and (ii) entering into post-petition reimbursement agreements under § 363(b) with the RSA Parties with which they had not executed pre-petition agreements.  (*Id.*; App. 895-96)  The proposed order also contained additional limitations on the scope of permissible reimbursements, including: (i) requiring that any reimbursable expenses be reasonable, documented, and reimbursable under the applicable reimbursement agreement; (ii) excluding reimbursement of fees incurred by an individual ad hoc group member for professionals retained by that member (including internal counsel); (iii) excluding reimbursement of fees and expenses of an individual ad hoc group member for filing objections to other creditors' claims or advancing or prosecuting the member's own claim; (iv) excluding reimbursement of fees and expenses incurred outside the scope of the reimbursement agreements

6

or in connection with litigation against Debtors; and (v) requiring reimbursement be subject to the interim compensation order.  (App. 793-94, 798-804, 1526-33)  The reimbursement agreements were all included as exhibits to the Second Fee Motion.  (App. 805-67, 868-81)  In further support of the Second Fee Motion, Debtors submitted another Eisenberg declaration, in which he reiterated and expanded on his prior testimony.  (App. 893-982)

Acthar Plaintiffs filed an objection (App. 1002-1114) and joined the objection filed by the UST (which again rested on the argument that § 503(b)(4) is the exclusive means of reimbursing an unsecured creditor's professional fees).  (App. 1002-1114, 383-99)  The Ad Hoc First Lien Term Lender Group renewed their objections, which Acthar Plaintiffs did not join or prosecute.  (App. 1115-38)  The UCC and OCC ultimately supported Debtors' Second Fee Motion, after accommodations were made to limit the scope of reimbursement to ensure benefit to the estate, consistent with the Bankruptcy Court's prior ruling.  (App. 1387-89, 1390-99)

On January 14, 2021, the Bankruptcy Court held a hearing on the Second Fee Motion. (App. 1305-1443)  Eisenberg testified and was cross-examined.  (App. 1312-55)  He reiterated his concern that, absent assurances of payment, the RSA Parties could abandon the RSA and their support for the reorganization.  (App. 1324-31)  Eisenberg emphasized the importance of organized ad hoc groups in "garner[ing] the support of the necessary" constituencies.  (App. 1319-22, 1325)  He made clear that the denial of the Initial Fee Motion had, as feared, stalled the progress of the cases, explaining that "we have come to a near halt in terms of the next . . . very most important phase of this case which is the allocation of opioid settlement proceeds."  (App. 1327)  In response to questioning by counsel for Acthar Plaintiffs, Eisenberg explained that, after the previous fee motion was denied, "debtors have not been able to make progress.  The plan had

been to start the mediation immediately after that hearing and all of that has been on hold pending resolution of the professional fees going forward." (App. 1348)

### D.    Bench Ruling and Fee Order

In a January 19, 2021 bench ruling, the Bankruptcy Court granted the Second Fee Motion, with two modifications. (App. 1444-58) The Bankruptcy Court found that Debtors had "met their burden of establishing the sound exercise of their business judgment under Sections 363 and 365 in assuming and/or entering into the reimbursement agreements with the professionals of the ad hoc groups at issue." (App. 1453-54)

The Bankruptcy Court also held that the motion and proposed order "complies with [the Court's] previous ruling regarding what would be required for reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups," and "ensures that only reasonable and necessary fees will be paid." (App. 1454) In particular, the Bankruptcy Court found that "good faith participation of the ad hoc groups in the mediation process is, in and of itself, beneficial to the debtors' estates as a whole," given "the unique nature of these cases, not just because of their size and complexity, but also because of the serious public health interests being addressed by this bankruptcy." (App. 1455) Consistent with Eisenberg's unrebutted testimony (App. 1324-31), the Bankruptcy Court credited "Debtors['] concern[s], based on the comments and actions by the ad hoc groups, that they will not actively participate in the mediation if they cannot be reimbursed for the costs associated with that effort." (App. 1455)

In approving the Second Fee Motion, the Bankruptcy Court imposed two additional requirements to further ensure that any reimbursements benefit the estate as a whole. "First, if the mediator informs the Court that the mediation has failed and there are no further prospects

for proceeding with mediation, reimbursement of all fees and costs will cease, pending further order of the Court;" and "[s]econd, if the mediator advises the Court that one or more of the ad hoc groups being reimbursed under this order are not acting in good faith in connection with the negotiations, then all reimbursements to those identified parties will cease immediately pending further order of the Court, and any fees and expenses already paid will be subject to disgorgement following a hearing and an opportunity to be heard."  (App. 1455-56, 1495)  On February 9, 2021, the Bankruptcy Court entered the Fee Order.  (App. 1491-98)

  **E.**  **Appeal of the Fee Order**

  Acthar Plaintiffs timely appealed the Fee Order.  (D.I. 1)  Acthar Plaintiffs did not seek a stay pending appeal or otherwise attempt to prevent reimbursement payments from being made while the appeal was pending.  Debtors have accordingly paid millions of dollars to the RSA Party professionals under the terms of the Fee Order and the reimbursement agreements.  (App. 1499-1514)  On March 10, 2021, Debtors and the RSA Parties amended the RSA to, among other things, (i) add as parties the Ad Hoc First Lien Term Lender Group (which had objected to entry of the Fee Order) and settle all outstanding issues with them (B.D.I. 1631-1); and (ii) eliminate the threat of termination due to delay in entry of the Fee Order (*id.* at 12-13).  The current RSA instead allows for termination if "the RSA Parties Fee Order is reversed, stayed, or modified, on appeal or otherwise."  (*Id.* at 13)  Mediation with the opioid claimants began shortly after the Fee Order was entered.  On April 20, 2021, Debtors filed a proposed plan. (B.D.I. 2074)  The plan, as amended (B.D.I. 6510), was confirmed on March 2, 2022.  (B.D.I. 6660)

  The merits of the appeal are fully briefed.  (D.I. 12, 15, 16, 17, 20)  No party requested oral argument.  The Court did not hear oral argument because the facts and legal arguments are

adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument.

## III.     JURISDICTION AND STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees."

"[W]ith respect to Section 363(b) motions . . . , the bankruptcy court has considerable discretion" and "may only be overturned on appeal if its decision was an abuse of discretion." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152-53 (D. Del. 1999).  A bankruptcy court's determination under §§ 363(b) or 365(a) that a debtor has satisfied the business judgment test by "articulat[ing] a reasonable basis for the business decision," in view of whether the transaction "is in the best interests of the estate," is a factual finding reviewed for "clear[] err[or]." *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016) (§ 363(b)), *aff'd*, 681 F. App'x 140 (3d Cir. 2017); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) (§ 365(a)); *In re Patterson*, 119 B.R. 59, 60 (E.D. Pa. 1990) (same).  Under the clear error standard, "[a] bankruptcy court's 'ultimate determination of fact' will not be set aside unless 'that determination is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data.'" *In re Culp*, 545 B.R. at 837 (citation omitted).  On "questions of law," the reviewing court "exercises plenary review." *Id.*

## IV.     DISCUSSION

The Bankruptcy Court entered the Fee Order pursuant to Sections 363(b) and 365(a), which permits approval of professional fees on a prospective basis.  On appeal, the principal

basis on which the Acthar Plaintiffs and the UST challenge the Fee Order is an argument based on § 503(b), and the canon of construction that the "specific controls the general."  Section 503(b), however, addresses creditor requests to pay professional fees on a retrospective basis. Section 503(b) is located in a different chapter of the Bankruptcy Code than Sections 363(b) and 365(a); it applies to different parties in different circumstances, and serves a different purpose, than the provisions that authorized the Bankruptcy Court's action.  None of the cases on which the Acthar Plaintiffs or the UST rely involves §§ 363(b) or 365(a), and none compels the relief they seek here.

The UST does not dispute that §§ 363(b) and 365(a) apply to the Debtors' request; nor does the UST contest the applicable business judgment standard or argue it is not met here. Acthar Plaintiffs similarly make no arguments about the applicability of § 363(b).  While Acthar Plaintiffs argue that § 365(a) does not apply – because the pre-petition reimbursement agreements are not sufficiently "executory" – Acthar Plaintiffs did not raise this argument below.

### A.     Approval of the Fee Order Pursuant to §§ 363(b) and 365(a) Is Proper

#### 1.     Sections 363(b) and 365(a) Apply and Are Satisfied

The Bankruptcy Court approved the relief set forth in the Fee Order pursuant to Sections 363(b) and 365(a) of the Bankruptcy Code.  Under § 363(b), a debtor-in-possession or "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b); *see also id.* § 1107 (debtor-in-possession has rights and powers of trustee).  Under § 365(a), the debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  *Id.* § 365(a).  Debtors filed a motion under § 363(b) seeking court approval ("after notice and a hearing") to "use" "property of the estate" (i.e., cash) to enter into post-petition reimbursement agreements with some of the

11

RSA Parties, to pay certain professional fees and expenses that benefited the estate.  Debtors similarly moved under § 365(a), seeking "court[] approval" to "assume" pre-petition reimbursement agreements with other RSA Parties (i.e., "executory contract[s]") to pay the same.  The Bankruptcy Court thus correctly held that §§ 363(b) and 365(a) provide the "right 'procedural mechanism[s]'" through which Debtors may seek to pay the RSA Party professional fees and expenses on a prospective basis.  (App. 761, 1453-54)

As the Debtors correctly point out, other courts have reached the same conclusion.  *See In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) (affirming reimbursement under § 363(b) of creditor's professional fees "to help evaluate and negotiate the terms of a plan"); App. 2214-20 (Order, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Dec. 2, 2019) ("*In re Purdue Pharma* Order") (approving, under §§ 363(b) and 365 payment, governmental plaintiff ad hoc committee's professional fees under reimbursement agreement); App. 1950-54 (Order, *In re Hercules Offshore, Inc.*, No. 15-11685 (KJC)) (Bankr. D. Del. Aug. 24, 2015) (approving, under §§ 363 and 365, payment of unsecured creditors' professional fees as part of RSA assumption); App. 1828-1949 (Order, *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) ("*In re Dendreon* Order")) (same); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 460-63 (Bankr. S.D.N.Y. 2014) (same under § 365); App. 1632-37 (Order, *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) (same); App. 1628-1631 (Order, *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. Jan. 18, 2013) (same); App. 1624-25 (Order, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) (similar under § 363).

The legal standard applicable to both §§ 363(b) and 365(a) is the business judgment test, under which a bankruptcy court will authorize debtor-initiated actions if the debtor shows that "a

sound business purpose justifies" such actions. *Culp*, 545 B.R. at 844; *see also In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (business judgment test applies to "debtor's use of assets outside the ordinary course of business," including "debtor's decision to [assume or] reject a contract") (citation omitted).  The test considers the benefit to the debtor's estate and, "[i]f a valid business justification exists, then a strong presumption follows that the agreement was negotiated in good faith and is in the best interests of the estate." *Culp*, 545 B.R. at 844.  Indeed, "[w]here the [debtor-in-possession] articulates a reasonable basis for the business decision, courts will generally not entertain objections." *Id.*; *see also Armstrong*, 348 B.R. at 162 (courts "uniformly defer[] to the" debtor under § 365(a)); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'") (citation omitted).

Applying this standard, the Bankruptcy Court "conclude[d] that the debtors have met their burden of establishing the sound exercise of their business judgment under Sections 363 and 365 in assuming and/or entering into the reimbursement agreements with the professionals of the ad hoc groups at issue."  (App. 1453-54)  The Bankruptcy Court specifically "determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest."  (App. 1492)  The Bankruptcy Court further credited "Debtors['] concern[s], based on the comments and actions by the ad hoc groups, that they will not actively participate in the mediation if they cannot be reimbursed for the costs associated with that effort," and found that the motion and proposed order "complies with . . . require[ments] for reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups"

13

and "ensures that only reasonable and necessary fees will be paid."  (App. 1454)

The Bankruptcy Court's factual findings are not clearly erroneous.  *See Culp*, 545 B.R. at 844.  Here, the Debtors submitted ample evidence that, without approval of the payments, ad hoc groups could have disbanded and the RSA Party professionals might have declined to actively participate in mediation regarding allocation of the fixed pool of opioid settlement consideration among governmental and private opioid claimants, a critical gating item for prosecuting the plan contemplated by the RSA.  (App. 515, 1325-27)  The Bankruptcy Court recognized that Debtors' continuing engagement and cooperation with the RSA Parties would be essential to a successful restructuring.  (App. 756, 1455)  The record reflects that Debtors' negotiations led to an RSA reflecting support from attorneys general for 50 (out of 56) U.S. states and territories (representing more than 95% of the national population), more than 1,300 municipalities, tribes, and other public opioid claimants, and over 84% of the Debtors' fulcrum-funded debt securities.  (App. 510-11, 903)  Piecemeal negotiation with thousands of states, municipalities, bondholders and others – rather than with three organized ad hoc groups represented by experienced advisors – was not a feasible option.  The UCC and OCC acknowledged the value of the organized ad hoc groups represented by the RSA Party professionals and supported the business justification for paying their fees.  (App. 695-98, 712)  Based on the record, the Court finds no clear error in the Bankruptcy Court's determination that the relief was a sound exercise of the Debtors' business judgment.

### 2.    The Prepetition Reimbursement Agreements Are Executory

Neither the Acthar Plaintiffs nor the UST advance any argument that § 363(b) does not apply by its own terms.  The UST also makes no argument as to how § 365(a) could be deemed facially inapplicable.  Nor does the UST argue that the Bankruptcy Court applied the wrong

standard under those provisions or that it misapplied the standard to the facts of this case.  (*See* D.I. 15 at 21) (recognizing "lenient business-judgment rule [is] typically applied to section 363 and 365 motions")  The Acthar Plaintiffs alone argue that § 365(a) does not apply because the pre-petition reimbursement agreements are not "executory."  They also appear to suggest the Bankruptcy Court misapplied the governing standard.  The Court does not agree.

Acthar Plaintiffs contend that the reimbursement agreements are not "executory contracts" and, therefore, cannot be assumed under § 365(a).  (D.I. 12 at 18-27)  Acthar Plaintiffs did not raise this issue below.  Acthar Plaintiffs did not file objections to the Initial Fee Motion and, while they purported to "concur and support" the UST's objections during the hearing, the UST had not made any argument about the "executory" nature of the agreements.  (App. 694; *see also* App. 383-99)  While the Acthar Plaintiffs filed extensive objections to the Second Fee Motion, they never raised an issue as to whether the relevant agreements were executory.  (App. 1002-14)  Acthar Plaintiffs purported to support the UST's objections to the Second Fee Motion, but again the UST did not raise this issue as to the Second Fee Motion either.  (App. 983-1001) Only the First Lien Term Lender Group objector pressed the "executory" issue, but Acthar Plaintiffs never purported to join, or otherwise prosecute, that group's objection.  (*See* App. 1115-38)  Because the Acthar Plaintiffs did not press the "executoriness" issue below, it should not be considered by this Court in the first instance.  *See In re Kaiser Grp. Int'l Inc.*, 399 F.3d 558, 565 (3d Cir. 2005) ("[T]he general rule that when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal.").

In any event, the pre-petition reimbursement agreements are "executory" within the meaning of § 365(a).  "An executory contract is a contract under which the obligation of both the

bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) (citation omitted). Put another way, the question is whether "obligation[s] . . . go to the very root of the parties' Agreement." *Id.* at 964. "Courts have ruled that contingent obligations under a contract are sufficient to render a contract executory when the contingent obligations are essential to the contract." *In re Safety-Kleen Corp.*, 410 B.R. 164, 166-68 (Bankr. D. Del. 2009) (agreement to indemnify damages arising from pre-and-post-closing environmental matters was executory); *In re Philip Servs. (Delaware), Inc.*, 284 B.R. 541, 550 (Bankr. D. Del. 2002) (similar), *aff'd*, 303 B.R. 574 (D. Del. 2003).

That standard is satisfied here. The Acthar Plaintiffs' argument applies only to assumption of the pre-petition reimbursement agreements – and in each of those agreements, both parties have ongoing duties of performance during the pendency of the bankruptcy. The RSA Party professionals committed to work on behalf of their clients, to negotiate and implement a restructuring, and Debtors agreed to pay the professionals' reasonable and documented fees and expenses for doing so. If the RSA Party professionals continue to provide the services contemplated by those agreements, Debtors must compensate them. If the RSA Party professionals were to stop performing, Debtors would be relieved of their compensation obligations (and vice versa).

That the RSA Party professionals' obligations are framed in terms of the scope of payment does not change the analysis. As the Debtors correctly argue, a contract is no less executory because one party can decide the extent to which it will exercise its contract rights. *See, e.g.*, *In re Kellstrom Indus., Inc.*, 286 B.R. 833, 835 (Bankr. D. Del. 2002) (right of first

refusal was executory because debtor was obligated "to sell to [the other contract party] if it matches the offer," and other party was "required to exercise or waive the right").  At a minimum, such agreements are executory where (as here) "the [party with an option to perform] has announced that he is exercising the option, but [has] not yet followed through" in full.  *In re Robert L. Helms Constr. & Dev. Co.*, 139 F.3d 702, 706 (9th Cir. 1998).

The Acthar Plaintiffs' argument that "Debtors already have the benefit they sought" (D.I. 12) ignores the Bankruptcy Court's finding that the reimbursement agreements will provide ongoing benefits to the estate, including ensuring the RSA Party professionals' support in mediation and in the negotiation of numerous documents necessary to implement the restructuring.  The Acthar Plaintiffs' heavy reliance on *In re Columbia Gas System*, 50 F.3d at 236-37, 243-44, is misplaced for similar reasons.  (*See* D.I. 12 at 20-22)  That case concerned settlement agreements whereby "class members were entitled to receive their share of . . . escrow monies only after they executed a release of claims and a supplemental contract," which the court determined were "functionally ministerial duties" that "would [provide] nothing of value." 50 F.3d at 236-37, 243-44.  Here, the remaining "obligation[s] . . . go to the very root of the parties' [a]greement[s]," *In re Exide Techs.*, 607 F.3d at 964, and, as the Bankruptcy Court found, assumption of these agreements will benefit the estate.

### 3.    The Business Judgment Standard Is Satisfied

Acthar Plaintiffs assert that Debtors failed to satisfy the business judgment rule.  (D.I. 12 at 37-38)  Acthar Plaintiffs describe Debtors' concerns regarding a "loss of 'momentum'" as a "prophecy," and suggest that it was "poor business judgment" to agree to pay the RSA Party professional fees when they already had to pay "the official committees' professional fees," especially because the RSA Party professionals can "terminate" the RSA for "Debtors having

17

missed the December 2020 deadline."  Again the Court disagrees.

As the Debtor correctly points out, the official committees and ad hoc groups play very different roles in these cases.  The official committees broadly advocate for the interests of the creditor constituencies they represent but, unlike the ad hoc groups, do not have authority to vote claims.  The official committees also are not (and do not include among their membership) governmental entities that can help broker broader consensus among other similarly situated public entities.  Moreover, the RSA was amended in March 2021 to remove the December 2020 fee order milestone, such that the RSA Parties *cannot* terminate the RSA for failure to have met that deadline.  (B.D.I. 1631-1, at 12-13)  The Acthar Plaintiffs' belief that the failure to pay such fees would have no adverse impact on the need to maintain forward momentum is unsupported, and Debtors submitted evidence to the contrary.  (App. 515-16, 1325-27)  The RSA Parties agreed that the reimbursement agreements were critical (App. 435-48, 498-501, 622-26, 1249-70), and so did both official committees (App. 696-98, 711-12).  The Bankruptcy Court made factual findings that the business judgment standard was satisfied.  (App. 1453-54, 1492, 1454-55)  The Acthar Plaintiffs' unexplained disagreement with those findings falls far short of establishing clear error.  *See Patterson*, 119 B.R. at 60.

### B.    Section 503(b) Does Not Apply or Otherwise Override §§ 363(b) or 365(a)

The only argument advanced by the UST as amicus (and one of many arguments pressed by Achtar Plaintiffs on appeal) is based on § 503(b), and consists of two parts.  (*See* D.I. 15 at 10-27)  First, § 503(b)(4) addresses the payment of fees and expenses for professional services provided to a creditor and, therefore, the argument goes, §§ 363(b) and 365(a) cannot do the same – despite their plain language.  Second, because § 503(b)(3)(D)'s "substantial contribution" test is retrospective in nature, it cannot be applied before plan confirmation.  According to the

Acthar Plaintiffs, Debtors cannot satisfy the "substantial contribution" standard regardless. Below the Court addresses, and rejects, each aspect of this argument.

### 1.    Section 503(b)(4) Does Not Override §§ 363(b) or 365(a)

As Debtors correctly point out, the UST's argument rests on a single canon of construction: the notion that a specific statute controls over a more general statute.  As the Supreme Court explained in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), "the general/specific canon" is applied either to "eliminate" a "contradiction" between two statutory provisions or to ensure that the general provision does not render the more specific provision "superflu[ous]."

In the Court's view, neither circumstance is presented here.  In these circumstances, as the Debtors correctly point out, a different canon of construction controls: "courts should interpret a statute with . . . an ear for harmonizing potentially discordant provisions." *Gov't Emps. Ret. Sys. of the Virgin Islands v. Gov't of the Virgin Islands*, 995 F.3d 66, 97 (3d Cir. 2021) (quoting *United States v. Bass*, 404 U.S. 336, 344 (1971)).  There is no contradiction between § 503(b), on the one hand, and §§ 363(b) and 365(a), on the other.  Nor would applying §§ 363(b) and 365(a) according to their terms render § 503(b)(4) superfluous.

All three statutory provisions can be given effect without raising any contradiction or superfluity concerns.  Sections 363(b) and 365(a), on the one hand, and § 503(b), on the other, are directed at different parties, operate at different times, and serve different purposes.  Sections 363(b) and 365(a) permit ***debtors*** (or trustees) to take actions for the benefit of the estate ***going forward*** based on their own ***business judgment***.  *See* 11 U.S.C. § 363(b)(1) (permitting "trustee, after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate"); *id.* § 365(a) (permitting "trustee, subject to the court's approval, [to]

19

assume or reject any executory contract or unexpired lease of the debtor").  Section 503(b), by contrast, permits *creditors* (often over debtor objections) to seek allowance of an administrative expense for *past contributions* to an estate under a *substantial contribution* standard.  *See id.* § 503(b)(3)(D) (permitting claim after "creditor . . . mak[es] a substantial contribution in a case under chapter 9 or 11 of this title").

Most of these distinctions are undisputed by the Achar Plaintiffs and UST.  Although the UST argues that § 503(b) is "not limited to creditors or otherwise exclusive of the debtor" and "contains no reference to any applicant" (D.I. 15 at 23), the UST cites no case in which a debtor has actually sought relief under § 503(b) in similar circumstances.  Regardless, statutory provisions do not have to be mutually exclusive for both to be given effect.  *See, e.g.*, *In re Udell*, 454 F.3d 180, 184-86 (3d Cir. 2006) (finding no conflict despite five-year "overlap" period during which two statutes apply, because "there is no overlap thereafter").  Even if debtors could seek retrospective relief under § 503(b), it would be no source of statutory tension if debtors could *also* seek authority to pay creditor professional fees under § 363 or 365 during a case for purposes that benefit the estate on a prospective or ongoing basis.

Acthar Plaintiffs suggest a superfluity problem but never explain how "[a]llowing payment under §§ 363 and 365" could possibly "render[] § 503 superfluous."  (D.I. 12 at 36) Creditors cannot seek payment under §§ 363(b) or 365(a), and therefore § 503(b) continues to serve a clear purpose.

The provisions are found in different chapters of the Bankruptcy Code, underscoring their distinct purposes.  Sections 363(b) and 365(a) are found in Chapter 3, Subchapter IV, entitled "ADMINISTRATIVE POWERS," which relates to powers of the trustee (11 U.S.C., ch. 3, subch. IV), whereas § 503 is found in Chapter 5, Subchapter I the Bankruptcy Code, entitled

"CREDITORS AND CLAIMS" (11 U.S.C., ch. 5, subch. I).  The fact that §§ 363(b) and 365(a)

relate to debtors' sale and use of estate property, whereas § 503(b) relates to creditors and

allowance of administrative expense claims, is additional evidence that the latter's requirements

were not intended to control in cases in which a debtor is seeking relief to pay for ongoing work

for the benefit of the estate.  *See generally Milavetz, Gallop & Milavetz, P.A. v. United States*,

559 U.S. 229, 252 (2010) (interpreting statute "codified in a subchapter of the Bankruptcy Code

entitled 'debtor's duties and benefits' . . . to govern advertisements aimed at creditors would be

. . . anomalous") (citation omitted).

Acthar Plaintiffs make a policy argument, suggesting the Court's interpretation of the

statutes creates the potential to "sidestep the dictates of Section 503" via the deferential business

judgment standard in §§ 363(b) and 365(a).  (D.I. 12 at 36)  Putting aside whether being

persuaded by this policy argument would lead to a different result in the instant appeal, the fact is

that the Court is not persuaded by it.  Congress appears to have given debtors – who are duty-

bound to maximize value for ***all*** parties-in-interest – wider latitude than creditors, whose role is

often limited to advancing their own narrow interests.  As the Third Circuit explained in *Lebron*

*v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3d Cir. 1994), the § 503(b) standard is directed at

concerns that "the benefit received by the estate must be more than an incidental one arising

from activities the applicant has pursued in protecting his or her own interests."  Those concerns

do not extend (at least to the same degree) to a debtor-in-possession, which owes a fiduciary duty

to the estate as a whole.  *See, e.g.*, *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del.

2001); *see also In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 12 (Bankr. S.D.N.Y. 2010)

(recognizing that § 503(b)'s "provisions are nonconsensual in nature" and "[b]y their terms, . . .

do not require [the applicant to obtain] the assent or agreement of the debtor, chapter 11 trustee,

or any other party"). That there are different standards for debtor-initiated relief and creditor-initiated relief is sensible and provides no reason to ignore the plain (and plainly applicable) language of §§ 363(b) and 365(a).

Moreover, several courts have rejected the argument that § 503(b) overrides §§ 363(b) or 365(a), and the Bankruptcy Court relied on precedent in highly analogous circumstances. For example, in *In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *11, the Southern District of New York held that "subsections 503(b)(3)(D) and (b)(4) do not bar a bankruptcy court from allowing a debtor in possession to reimburse a creditor for professional fees – provided, of course, that the standard for allowing transactions under § 363(b) has been met." The court explained that "503(b)(3)(D) and (b)(4) are not rendered meaningless simply because in certain unique circumstances a bankruptcy court approves a debtor's motion to enter into an agreement to reimburse a creditor for professional fees," especially because "[i]n most cases, a debtor will make no such motion, as it will not be in its business interest to do so – or the court will refuse approval under § 363(b)." *Id.* The *Bethlehem Steel* court concluded that, because "in most cases, if a creditor wants to be reimbursed, it must file an application under subsections 503(b)(3)(D) and (b)(4) . . . [t]hose provisions continue to serve a purpose." *Id.*

More recently, with respect to another opioid-related bankruptcy filing, a bankruptcy court in New York applied the same reasoning to permit debtors to reimburse an ad hoc committee's professional fees under § 363(b) and 365(a). (App. 2214-20 (*In re Purdue Pharma* Order); *see also* App. 2190 (*In re Purdue Pharma* Nov. 19, 2019 Hr'g Tr.) There, the debtors moved to assume a reimbursement agreement and pay reasonable and documented fees under §§ 363(b) and 365(a). (App. 2215) The UST objected, arguing that "the code has a more specific standard to pay the fees of an ad hoc committee and that would be under 503(b)(3)(d)

and (4) which require the ad hoc committee to show a substantial contribution before their fees can be paid."  (App. 2161-62)  Adopting the reasoning of *Bethlehem Steel*, the *Purdue Pharma* court disagreed, explaining that "there are a number of . . . fact patterns under the Bankruptcy Code where Courts have approved payments of ongoing fees and expenses not under Section 503(b) but under Section 363(b) or sometimes under Section 365," and specifically referencing requests for approval of an RSA, legal fees of proposed bidders, and the fees and expenses of secured creditors.  (App. 2190-92)  As in those situations, the *Purdue Pharma* court concluded that the legal standards of §§ 363(b) and 365(a) applied in the circumstances before it and assessed "whether the entry into the agreement and the performance of it including the ongoing payment of the professional fees is a proper exercise of business judgement and in the best interest of the debtors and their estates and creditors."  (App. 2192-93)

Other courts have held likewise.  (App. 1828-1949 (*In re Dendreon* Order) (approving professional fee payments under §§ 363 and 365 over UST's objection); App. 1955-96 (Hr'g Tr., *In re RCS Capital Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 16, 2016), [Doc. No. 334]) ("I disagree with the United States Trustee that I need to wait and see if the plan is confirmed before I can approve such [professional] fees.").  The cases relied upon by the Acthar Plaintiffs and the UST are inapposite.  None of those cases considered the interplay between § 363(b) or § 365(a) and § 503(b).

Acthar Plaintiffs and the UST rely primarily on a series of cases in which the Third Circuit affirmed a bankruptcy court's decision not to approve break-up fees under § 503(b).  *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999), involved a retrospective request for payment of a break-up fee and expenses by a disappointed bidder, Calpine, in connection with its unsuccessful bid.  The decision did not involve (at least in

23

relevant part) a request by the debtor for prospective authorization to award Calpine a break-up fee and expense reimbursement; in fact, that authorization had been sought, but previously denied, by the bankruptcy court on the grounds that it would chill bidding.  *See id.* at 529.  The Calpine motion was "originally captioned" as a "motion under 11 U.S.C. § 503(b);" despite Calpine's later attempts to argue that the motion was governed not by that section but instead by "the applicable case law setting forth standards for approval of break-up fees and break-up expenses," the court found § 503 to be "the most likely source of authority" for the motion.  *Id.* at 527, 532.

The portion of *O'Brien* on which appellants and UST rely most heavily is the Third Circuit's statement that it found no support for the proposition that "courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code."  *Id.* at 532.  This statement must be understood in context; specifically, in the context of a ***non-debtor*** requesting to recover on its claim from estate assets while admitting it had no statutory basis to do so.  *See id.* at 532 (noting that creditor asserted right to recover only under "applicable case law" rather than any provision of Bankruptcy Code).  Here, the Debtors made their request in express reliance on § 363 of the Bankruptcy Code.  In the context of addressing Calpine's attempt to disclaim the only asserted statutory basis for relief, and recharacterize its "request" as one "made under the applicable case law," the *O'Brien* court explained that there was no "support for the proposition that courts may create a right to recover from the bankruptcy estate where no such right exists under the Bankruptcy Code," and then "decline[d] the invitation to develop a general common law of break-up fees."  *Id.*  Notably, the court cited § 363 as one example by which the Bankruptcy Code ***did*** provide for such relief.  *See id.* (filing of Chapter 11 petition "precludes all efforts to obtain or distribute property of the estate other than as provided

24

by the Bankruptcy Code, *see* 11 U.S.C. §§ 362, 363, 1123").  In short, *O'Brien* addressed whether a disappointed bidder could itself seek extra-statutory relief – not whether, as here, a debtor could seek relief under other statutory provisions.

The UST cites two cases applying *O'Brien* (again, to break-up fees), but neither addresses whether the debtor can seek such fees under §§ 363(b) or 365(a), and neither says anything about the sort of professional fees at issue here.  *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-09 (3d Cir. 2010), simply applied the § 503(b) standard to an unsuccessful bidder's application for a break-up fee.  *In re Energy Future Holdings Corp. ("EFH I")*, 904 F.3d 298, 314-16 (3d Cir. 2018), held only that the bankruptcy court did not violate Federal Rule of Civil Procedure 59(e) in reconsidering its earlier break-up fee decision that had been based on a mistake of fact.

Other courts have declined to extend the reasoning of *O'Brien* even to relatively analogous circumstances like bidders' "due diligence reimbursement fees," which can "be reimbursed regardless of whether the [bidders] were ultimately successful."  *In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (distinguishing *O'Brien* and *Reliant* as "appl[ying] section 503(b) and not 363(b)" and involving "break-up fees [that] were to be paid only if the prospective bidder was unsuccessful").

The UST also cites *In re F/S Airlease II, Inc.*, 844 F.2d 99, 108 (3d Cir. 1988).  In that case, the Third Circuit refused to allow a professional to recover fees under § 503(b)(1)(A) when he was ineligible to recover the same fees under the neighboring provision, § 503(b)(2), because he failed to comply with a necessary precondition to recovery.  The court explained that "section 327(a)" puts requirements on the "authority to pay administrative expenses for [trustee-employed] professionals" under § 503(b)(2).  *Id.* at 108.  The professional had failed to obtain

the prior approval required under § 327(a), despite being "a sophisticated businessman who was represented by attorneys," *id.* at 106-08, which is why he sought relief under § 503(b)(1) instead. The court refused to read two provisions – 503(b)(1) and (b)(2) – that actually do "exist side-by-side" (D.I. 15 at 18) (unlike the provisions at issue in the instant case) as covering precisely the same expenses in a way that would allow professionals to circumvent a critical statutory pre-approval requirement.  The Court agrees with the Debtors, therefore, that *F/S Airlease II* has little to do with this case.[3]

The Acthar Plaintiffs also rely on the Southern District of New York's decision in *In re Lehman Bros. Holdings Inc.*, 508 B.R. 283 (S.D.N.Y. 2014). There, the court refused to allow individual members of an official creditors committee to rely on §§ 1123(b)(6) and 1129(a), instead of § 503(b), to recover expenses on a retrospective basis, as part of a plan of reorganization.  *See id.* at 288-89, 293.  The court explained that § 503(b) expressly prohibited such payments absent the necessary "substantial contribution," and that parties could not effectively contract around that prohibition by agreeing to include the payments in the plan itself. *See id.* at 289-94.  *Lehman Brothers* thus focused on retrospective payments expressly prohibited by § 503(b).  It, like all the other authorities cited by appellants, does not persuade the Court to reach a different outcome.

### 2. Section 503(b)'s Substantial Contribution Test Is Inapplicable

The Acthar Plaintiffs spend much of their brief arguing that Debtors failed to satisfy § 503(b)'s "substantial contribution" test.  (D.I. 12 at 45-50)  To the extent they argue that

---

[3] The Acthar Plaintiffs cite two out-of-circuit cases that stand for the same general principle as *F/S Airlease* and are distinguishable for the same reasons.  *See In re Snowcrest Dev. Grp., Inc.*, 200 B.R. 473, 479 (Bankr. D. Mass. 1996); *In re Off. Prods. of Am., Inc.*, 136 B.R. 675, 686-87 (Bankr. W.D. Tex. 1992).

§ 503(b) is retrospective only and could not have been satisfied when the Debtors brought the Initial Fee Motion at the outset of these cases, the Court agrees. But this argument leads back to whether § 503(b) overrides the prospective options available to Debtors under §§ 363(b) and 365(a) – as the Court has explained, it does not. To the extent the Acthar Plaintiffs are making a record-based argument about whether the reimbursement agreements actually further the interests of the estate, the Bankruptcy Court made ample findings in support of its decision, and they are not clearly erroneous.

While § 503(b)'s substantial contribution standard has no role in assessing compliance with §§ 363(b) or 365(a), the business judgment rule, which does apply, considers whether entering into post-petition reimbursement agreements, or assuming pre-petition reimbursement agreements, is in the best interest of the estate. As the district court explained in *Bethlehem Steel*, 2003 WL 21738964, at *10, "Section 363(b) does not permit the debtor in possession to use funds solely to benefit a creditor. If the payment of a creditor's fees were simply aimed at helping the creditor promote its own self-interest, the payment would not be permitted under § 363(b)." That is the standard the Bankruptcy Court applied and found satisfied here. (*See, e.g.*, App. 1454) (proposed order "complies with [the court's] previous ruling regarding what would be required for reimbursements . . . in that it assures that the reimbursements will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups"))

Thus, all of the Acthar Plaintiffs' arguments under the "substantial contribution" heading either apply the wrong standard or merely take issue with the Bankruptcy Court's non-erroneous factual findings. For example, the Acthar Plaintiffs suggest the Bankruptcy Court "assum[ed], without evidence, that participation in mediation will in some way materially enhance the

recovery to other creditors." (D.I. 12 at 44) Acthar Plaintiffs do not address, however, Debtors'
unrebutted evidence: the uncertainty, loss of confidence, and likely need to "spend substantially
more time in bankruptcy (with correspondingly higher restructuring costs)," all support the
finding that "loss of RSA Party support would be detrimental not only to the Debtors, but to all
creditors." (App. 515-16) Similarly, the assertion that "the mediation benefitted only those
participating in it" (D.I. 12 at 47) ignores the Bankruptcy Court's contrary findings (*see* App.
1454-55).

### 3.     Acthar Plaintiffs' Remaining Arguments Are Unavailing

The Acthar Plaintiffs' remaining arguments, which the UST does not advance, fare no
better. Acthar Plaintiffs invoke the law of the case doctrine (D.I. 12 at 28-31, 41-42) to argue
that the Bankruptcy Court was required to apply § 503(b) and its "substantial contribution"
standard in ruling on the Second Fee Motion, based on dicta contained in the bench ruling on the
Initial Feel Motion. In the Court's view, the Acthar Plaintiffs misread the Bankruptcy Court's
interim bench ruling on the Initial Fee Motion. The Bankruptcy Court never said that "11 U.S.C.
§ 503 controlled." (D.I. 12 at 41) (citing App. 727-66) If that had been its holding, there would
have been no reason to deny the motion without prejudice. Nor would the Bankruptcy Court's
ruling that "Section 363 provides the procedural mechanism" for the relief sought have made
sense. (App. 761) Rather, the Bankruptcy Court allowed Debtors to renew their request under
§§ 363(b) or 365(a) after entering into new reimbursement agreements and/or assuming the pre-
petition reimbursement agreements. (App. 765)

Additionally, the law of the case doctrine binds litigants; it does not limit a court's power.
*See Speeney v. Rutgers*, 369 F. App'x 357, 359 (3d Cir. 2010) ("The law of the case . . . is a
discretionary doctrine [and] not a restriction on the court's power."). Furthermore, an interim,

incorrect ruling would not bind this Court on appeal.  *See Musacchio v. United States*, 577 U.S. 237, 245 (2016) ("An appellate court's function is to revisit matters decided in the trial court. . . . [I]t is not bound by district court rulings under the law-of-the-case doctrine.").

The remaining arguments raised by the Acthar Plaintiffs are also rejected.  Their argument that payments authorized by the Fee Order violate the absolute priority rule is misplaced for the reasons set forth in the Debtors' brief.  (*See* D.I. 17 at 50-52)  The Court rejects Acthar Plaintiffs' unfounded and inappropriate allegations of criminal fraud in arguing that the Bankruptcy Court's order violates public policy.  (*See* D.I. 12 at 55-58)

## V.  CONCLUSION

For the foregoing reasons, the Fee Order will be affirmed.  An appropriate Order follows.

March 28, 2022
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES CIRCUIT JUDGE